865 A.2d 761

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Kevin HUGHES, Appellant.**

Supreme Court of Pennsylvania.

Submitted May 22, 2002.

Decided Dec. 21, 2004.

Reargument Denied Feb. 18, 2005.

278

280

286

288

Billy Horatio Nolas, Esq. Philadelphia, for Kevin Hughes.

Hugh J. Burns, Esq., Amy Zapp, Esq., Philadelphia, for Commonwealth of Pennsylvania.

BEFORE: CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## OPINION

Justice SAYLOR.

This is an appeal in a capital case from an order dismissing Appellant's petition for post-conviction relief.

On March 1, 1979, at approximately 8:15 a.m., the victim, nine-year-old Rochelle Graham, was dropped off near her school. As the victim was walking through the school playground, she encountered Appellant, who was 16 years, 11

months, and 24 days old, and whom she knew through an aunt. Appellant took the victim to a nearby vacant house at 1617 Olive Street in Philadelphia, where he forcibly removed her pants and underwear, attempted vaginal intercourse, and engaged in anal intercourse. Appellant then choked the victim to death, gathered flammable material from the room, placed it on top of her, and with a cigarette lighter, set the material on fire. At some point, Appellant also used the lighter to begin burning his nickname, "Peanut," on the ceiling of the room, writing "PEA."

At 10:30 a.m. that morning, police and fire personnel responded to a fire at the Olive Street address. Inside, police found the victim's partially burned body lying on the floor with her legs spread apart. Detectives investigating the scene observed that the victim's underwear and pants were torn, with blood running from her vaginal area, and noticed the letters burned into the ceiling of the room. A medical examination of the victim revealed bruising and tearing of her vaginal and anal areas and soft tissue bruising of her neck, but no indication of smoke inhalation. The medical examiner concluded that the victim's injuries were consistent with the attempted penetration of her vagina and the actual penetration of her rectum, and that she died from manual strangulation.

The murder went unsolved for approximately ten months. Then, on January 5, 1980, Appellant attacked a 13–year–old girl, M.O., grabbing her from behind and forcing her into a vacant house. Appellant ordered M.O. to undress and perform oral sex, after which, he choked her until she was unconscious. M.O. awoke in a closet a few minutes later and reported the assault to police, who presented her with a photographic array that included a picture of Appellant. M.O. identified Appellant, and an arrest warrant was issued. Upon executing the warrant at Appellant's home, police noticed that the word "PEANUT" had been burned into the ceiling of his bedroom.

Following his arrest, Appellant was interviewed regarding the assault of M.O. As he was a juvenile, Appellant was

accompanied by two of his uncles; he was also advised of his constitutional rights. Appellant confessed to the assault of M.O. and, noting the similarities between that assault and the present matter,[1] the detectives who were investigating the homicide of Ms. Graham advised Appellant that they would like to question him about her death. After being informed of his constitutional rights a second time, Appellant initially denied any involvement in Ms. Graham's death. Later in the interview, however, Appellant admitted that he had sexually assaulted and killed Ms. Graham. The following day, Appellant was again interviewed regarding the Graham homicide; on this occasion, he was accompanied by one of his uncles, was apprised of his constitutional rights, and again confessed to the crimes.

Shortly after his arrest, and in connection with whether he should be prosecuted as an adult for charges involving M.O., Appellant was evaluated by a court appointed psychologist, Clare Wilson, Ph.D. In her report, Dr. Wilson noted, *inter alia*, that: Appellant was functionally illiterate; his comprehension, social judgment, and reasoning were deficient; his thinking was concrete and stereotypical; his full scale intelligence quotient was in the low average range; and mild brain damage could not be conclusively ruled out.[2] Ultimately, the charges involving M.O. were transferred to the criminal court. Appellant also unsuccessfully moved for decertification in the present matter, seeking to have the charges prosecuted in juvenile court.

Subsequently, Appellant was found incompetent and, on May 6, 1980, was transferred to the forensic unit of the Philadelphia State Hospital. Although the initial psychiatric evaluations of Appellant indicated that he did not suffer from a major mental illness,[3] he was prescribed a conservative

1. In addition to the similar manner of execution of the crimes, the assaults were committed in the same general proximity and within a five minute walk of Appellant's home.

2. Although not reflected in Dr. Wilson's report, Appellant made incriminating statements regarding the Graham case during the evaluation.

3. Appellant was described as suffering from severe neurosis and/or a schizoid personality disorder.

amount of Thorazine, an antipsychotic medication. Some months later, Appellant's condition improved, and he was found fit to stand trial following a competency hearing.

Thereafter, Appellant moved to suppress evidence and his statements. Prior to the hearing on that matter, counsel for Appellant orally requested a further competency examination, which was granted. Appellant was evaluated by Edwin Camiel, M.D., a psychiatrist employed with the Psychiatric Unit of the Probation Department of the Philadelphia Court of Common Pleas, who testified at the ensuing competency hearing that Appellant showed no psychiatric abnormality and appeared to have a rational and factual understanding of the proceedings. Dr. Camiel noted, however, that Appellant exhibited some evidence of concrete thinking, and that he had reported hearing voices telling him to commit suicide. Dr. Camiel concluded, nevertheless, that Appellant was not so psychologically impaired that he could not proceed to trial. The court then permitted counsel to have Appellant examined by a psychiatrist retained by Appellant, Robert B. Blumberg, D.O. Following a review of Appellant's records and an interview of him, Dr. Blumberg opined that Appellant was not competent to stand trial, as he suffered from persistent delusion, was profoundly disturbed, and was detached from reality. In light of Dr. Blumberg's testimony, the common pleas court directed an examination by a court-appointed expert, Richard B. Saul, M.D., a clinical psychiatrist. Upon evaluating Appellant, which included a review of his mental health records, Dr. Saul opined that Appellant was oriented as to time, person, and place, and could communicate with his attorney and understand the proceedings. Dr. Saul acknowledged that Appellant reported hearing voices in his cell and observed that he suffered from a psychotic illness (schizophrenia). Dr. Saul concluded, nevertheless, that Appellant's schizophrenia was in remission, noted that he was being treated with Thorazine, and opined that such medication should continue through the trial. The court found Appellant competent and, in response to a request from the prosecutor, ordered the prison officials to continue his medication. The trial court then proceeded to

address Appellant's suppression motion, which it denied following a hearing.

Appellant's trial commenced on February 17, 1981,[4] with the Commonwealth's case centering upon Appellant's confessions and circumstantial evidence indicating his involvement, specifically, that: the letters burned into the ceiling of the crime scene were consistent with Appellant's nickname and those appearing in his bedroom; the assault involving M.O. was substantially similar to that in the present matter and tended to establish that Appellant was the perpetrator; and Appellant's route to school provided him with an opportunity to have committed the offenses.[5] The defense countered by contesting the circumstances surrounding Appellant's statements, particularly, that Appellant was unable to read and write and was intellectually unable to have articulated the details of the crimes as they appeared in the statements; the defense also emphasized that Appellant was at school on the day of the crime. Appellant presented testimony from his uncle, Morris Hawthorne, who, in addition to testifying about Appellant's statements, noted that he had never seen Appellant and his mother together, and that Appellant had the intellectual capacity of a two-year old. Appellant testified in his own defense, challenging his admissions to the detectives, and maintaining that he did not sexually assault and murder the victim.

The Commonwealth presented rebuttal evidence concerning, *inter alia*, Appellant's confessions. In addition, the Commonwealth sought to introduce incriminating statements that Appellant made to Dr. Wilson during her psychological evalua-

4. Appellant's crimes and his prosecution coincided with the disappearance of a number of African–American children in the Atlanta, Georgia, area. *See generally Williams v. State*, 251 Ga. 749, 312 S.E.2d 40 (1983). As a result, some spectators and certain members of Appellant's jury were wearing green ribbons as a sign of support for the missing children. At the request of Appellant's counsel, the trial court ordered the spectators to remove the ribbons, and the jurors similarly agreed. In addition, the jurors were questioned by the court as to whether such demonstration affected their impartiality.

5. There was also evidence presented concerning Appellant's unusual conduct around the victim's family following the crime.

tion, namely, that he had set a fire in an abandoned house on the date of the crimes and had raped, killed, and set the victim on fire. In response to Appellant's objection to these statements, the court conducted a hearing, received argument concerning such proof, and ruled that the Commonwealth could not introduce Appellant's admission to raping and killing the victim, but it would be permitted to elicit Appellant's admission to setting a fire in a vacant house on March 1, 1979. Although the Commonwealth did not then call Dr. Wilson, Appellant presented testimony from her concerning his limited intellectual capacity and functioning, including the indication of mild brain damage.[6] Counsel for Appellant also elicited that Dr. Wilson had been subpoenaed by the Commonwealth. On cross-examination, the prosecutor sought to explain the reason Dr. Wilson had been subpoenaed, revealing, over objection, Appellant's incriminating statement of having set a fire in an abandoned house on the date of the offenses.

Appellant was found guilty and, in the penalty phase, the Commonwealth offered as aggravating circumstances that the murder was committed during the perpetration of a felony, and that Appellant had knowingly created a grave risk of danger to another person in addition to the victim when he committed the offense. *See* 42 Pa.C.S. § 9711(d)(6), (7). With respect to the former, the Commonwealth incorporated the testimony of the medical examiner and Appellant's statement. In support of the grave risk aggravator, the Commonwealth presented testimony that other homes along Olive Street were occupied. In mitigation, Appellant initially sought to invoke that he had no significant history of prior criminal convictions, *see* 42 Pa.C.S. § 9711(e)(1); however, the trial court ruled that evidence concerning his lack of a significant criminal history and/or any evidence of good character would open the door for the Commonwealth to rebut such proof with evidence that Appellant had been involved in a sexual assault as a juvenile,

---

6. Although Dr. Wilson testified to Appellant's diminished mental capacity, she also stated that "[h]is true capacity is fully normal." With respect to the indication of mild brain damage, Dr. Wilson noted that confirmation of such diagnosis would require neurological testing, which she did not administer.

although he had not been adjudicated delinquent for such offense. As a result, counsel for Appellant opted to forego submission of the mitigating circumstance under Section 9711(e)(1), as well as any evidence of good character. Appellant thus offered as mitigating circumstances his age and the catch-all mitigator concerning his character, record, and the circumstances of the offense. *See* 42 Pa.C.S. § 9711(e)(4), (8). In support of the latter, Appellant did not present any testimony, instead relying upon evidence presented during the guilt phase by his uncle and Dr. Wilson, namely, that he had been abandoned by his mother, had a diminished mental capacity, and may suffer from mild brain damage.

The jury returned with a verdict of death, finding one aggravating circumstance (that the murder was committed in perpetration of a felony) and no mitigating circumstances. On post-verdict motions and direct appeal, Appellant was represented by trial counsel and raised as issues: the propriety of the competency determination; the voluntariness of his confessions; the fact that several spectators and members of the jury were wearing green ribbons to symbolize the plight of African–American children in Atlanta, which suggested their predisposition and denied him a fair trial; and trial court error in allowing the Commonwealth to introduce other crimes evidence, specifically, the sexual assault involving M.O. The trial court denied post-verdict relief, and this Court affirmed on appeal. *See Commonwealth v. Hughes,* 521 Pa. 423, 555 A.2d 1264 (1989).

In November of 1995, Appellant requested and was granted a stay of execution, and counsel was appointed to pursue post-conviction relief. On June 12, 1996, Appellant filed an "Amended Petition Pursuant to the Post–Conviction Relief Act." *See generally* 42 Pa.C.S. §§ 9541–9546 (the "PCRA"). However, in October of 1996, counsel from the former Center for Legal Education Advocacy and Defense Assistance entered their appearance on Appellant's behalf and, on November 18, 1996, filed a 315–page "Amended Petition for Habeas Corpus Relief Under Article I, Section 14 of the Pennsylvania Constitution and for Post–Conviction Relief under the Post–Convic-

tion Relief Act and Consolidated Memorandum of Law." On May 27, 1997, and again on September 2, 1998, Appellant filed supplemental petitions for post-conviction relief. The various amended and supplemental petitions contained 24 separate "Claims for Relief," with certain of the claims involving multiple allegations of legal error in connection with ineffective assistance of counsel, including that: Appellant was not competent during trial, post-verdict motions, and on direct appeal; he should not have been tried as an adult; his statements to the police were involuntary, and the waiver of his constitutional rights was not knowingly, intelligently and voluntarily given; he was entitled to have the jury selection proceedings transcribed and to reinstatement of his direct appeal rights with respect to all jury selection issues; he was tried while involuntarily drugged; counsel failed to investigate, develop and present mental health defenses; counsel did not seek a cautionary instruction surrounding the improper admission of other crimes evidence; testimony from the psychologist, Dr. Wilson, that Appellant had admitted setting a fire in an old house on the day of the offense was improperly admitted; numerous errors occurred in connection with the guilt-phase jury instructions; Appellant was improperly precluded from introducing mitigating evidence that he did not have a significant history of prior convictions; the jury failed to consider and was impeded from considering Appellant's age as a mitigating circumstance; the death sentence was unconstitutionally imposed, as jurors wore green ribbons symbolizing their sympathy for families of African–American children murdered in Atlanta, and the court failed to question the jurors as to the effect of the Atlanta killings upon the sentencing decision; the prosecutor's penalty phase argument was unconstitutional; the penalty phase jury instructions unconstitutionally indicated that the jury had to unanimously find a mitigating circumstance before giving it effect; the penalty phase jury instructions erroneously implied that a life sentence carried with it a possibility of parole; the jury was unconstitutionally instructed during the penalty phase that capital punishment is "the American way"; and counsel failed to adequately investigate and develop mitigating evidence.

The Commonwealth filed a motion to dismiss, asserting, *inter alia*, that Appellant's allegations were either: waived, previously litigated, untimely by virtue of the delay in filing the PCRA petition, or meritless. The late Honorable Robert A. Latrone heard argument on four of the issues; however, before disposing of the case, he passed away. The matter was reassigned to the Honorable C. Darnell Jones, II, who granted the Commonwealth's motion. Following an appeal and the filing of a statement of matters complained of on appeal, the PCRA court issued an opinion, noting that delay is a factor in evaluating the merits of a petition, and concluding that an evidentiary hearing was unnecessary, as Appellant's claims were either previously litigated or without merit.

Before this Court, Appellant raises the same issues presented to the PCRA court. Consistent with the eligibility requirements of the PCRA, Appellant frames his claims as involving a violation of the United States or Pennsylvania Constitutions or laws of the United States, the denial of effective assistance of counsel, or a proceeding in a tribunal without jurisdiction. *See* 42 Pa.C.S. § 9543(a)(2)(i, ii, viii). To prevail on his ineffectiveness allegations, Appellant must demonstrate that the underlying claim is of arguable merit; that no reasonable strategic basis existed for counsel's act or omission; and that counsel's error resulted in prejudice, namely, that there is a reasonable probability that the outcome of the proceeding would have been different. *See Commonwealth v. Kimball*, 555 Pa. 299, 312, 724 A.2d 326, 333 (1999). In addition, Appellant must establish that his claims have not been previously litigated or waived. *See* 42 Pa.C.S. § 9543(a)(3). An issue is previously litigated if the highest appellate court in which Appellant could have had review as a matter of right ruled upon the merits of the issue. *See* 42 Pa.C.S. § 9544(a)(2). An issue will be deemed waived if Appellant could have raised it, but failed to do so before trial, at trial, or on appeal. *See* 42 Pa.C.S. § 9544(b). As noted, Appellant was represented by the same counsel at trial and on direct appeal; thus, the PCRA proceeding was his first oppor-

tunity to challenge the stewardship of prior counsel.[7] For this reason, Appellant's ineffectiveness claims are not waived. *See Commonwealth v. Lambert*, 568 Pa. 346, 363, 797 A.2d 232, 242 (2001) (Opinion Announcing the Judgment of the Court).

## Delay

 Preliminarily, the Commonwealth contends that Appellant's PCRA petition was properly dismissed on timeliness grounds pursuant to Section 9543(b) of the PCRA. *See* 42 Pa.C.S. § 9543(b).[8] Appellant's direct appeal to this Court was decided on March 13, 1989, and his judgment became final at the expiration of the time for seeking review in the United States Supreme Court, specifically, June 11, 1989. *See* 42 Pa.C.S. § 9545(b)(3) (defining when a judgment becomes final). Appellant filed his amended PCRA petition seven years later, on June 12, 1996. The Commonwealth maintains that it suffered prejudice from Appellant's unexplained delay, particularly since the trial judge has passed away, thereby depriving the parties and the courts of any insights or analysis he could have provided. Appellant responds that any delay resulted from his serious mental illness, and the Commonwealth has not identified how it has been prejudiced.

7. In this respect, Appellant's circumstance is distinct from that where new counsel was appointed during direct appeal. In the context of the PCRA, the latter paradigm would entail a layered claim of ineffectiveness, in which a petitioner is required to frame and prove the allegation based upon the acts or omissions of appellate counsel. *See Commonwealth v. McGill*, 574 Pa. 574, 586–89, 832 A.2d 1014, 1021–23 (2003) (addressing the pleading and proof requirements for a layered claim of ineffectiveness).

8. This provisions provides:
 **(b) Exception.**—Even if the petitioner has met the requirements of subsection (a), the petition shall be dismissed if it appears at any time that, because of delay in filing the petition, the Commonwealth has been prejudiced either in its ability to respond to the petition or in its ability to re-try the petitioner. A petition may be dismissed due to delay in the filing by the petitioner only after a hearing upon a motion to dismiss. This subsection does not apply if the petitioner shows that the petition is based on grounds of which the petitioner could not have discovered by the exercise of reasonable diligence before the delay became prejudicial to the Commonwealth.
 42 Pa.C.S. § 9543(b).

While the PCRA court noted that delay may be considered in assessing the merits of Appellant's claims, there is no indication in its opinion that any of the claims were dismissed for this reason. More important, Appellant's PCRA petition was dismissed without a hearing, and Section 9543(b) specifically precludes a dismissal based upon delay absent a hearing. *Accord Commonwealth v. Weinder*, 395 Pa.Super. 608, 629, 577 A.2d 1364, 1375 (1990) (remanding for a hearing to determine whether the Commonwealth has been prejudiced in its ability to re-try the defendant). Thus, we cannot affirm the PCRA court's dismissal on this basis.

**Pre–Trial**[9]

■ While acknowledging that trial counsel moved to have the charges transferred to juvenile court, Appellant argues that the transfer proceeding was fundamentally flawed, as the court focused upon the offense and the availability of secure juvenile facilities, as opposed to mitigating factors respecting Appellant's background, for example, his traumatic childhood, mental illness, and brain damage. In this regard, Appellant asserts that prior counsel rendered ineffective assistance by failing to renew the transfer motion after Appellant's competency-based hospitalization since, under the version of the Juvenile Act in effect at that time, a defendant's mental capacity was a consideration in assessing whether to transfer a case to juvenile court. *See* Act of April 28, 1978, P.L. 202, No. 53, § 30 (providing that, in determining whether a child should be transferred, the court must consider, *inter alia*, whether the child is committable to an institution for the mentally retarded or mentally ill).[10] In addition, Appellant contends that prior counsel should have challenged the transfer decision on direct appeal. The PCRA court declined to review this issue, viewing it as failing to implicate the truth determining

9. As Appellant's claims implicate the pre-trial, guilt and penalty proceedings, and post-verdict/appeal stages, the issues have been re-ordered consistent with the stage of the proceedings to which they relate.

10. Although the section relates to the considerations governing transfers to criminal court, such criteria have been deemed relevant in present context. *See Commonwealth v. Pyle*, 462 Pa. 613, 619–20, 342 A.2d 101, 104–05 (1975).

process and thereby falling outside the eligibility requirements of the PCRA. *See* 42 Pa.C.S. § 9543(a)(2)(ii) (limiting relief in the context of ineffectiveness to those claims affecting the truth determining process).

The eligibility criteria in Section 9543 of the PCRA include claims asserting that the proceeding was held in a tribunal without jurisdiction. *See* 42 Pa.C.S. § 9543(a)(2)(viii). The propriety of whether charges should be prosecuted in the juvenile court or adult court system implicates jurisdictional concerns. *See generally* Act of July 9, 1976, P.L. 586, No. 142, § 2, ch. 63 (Subchapter B of the Juvenile Act entitled "Jurisdiction and Custody"); *Commonwealth v. Potts,* 449 Pa.Super. 306, 311, 673 A.2d 956, 958 (1996); *Commonwealth v. Zoller,* 345 Pa.Super. 350, 355, 498 A.2d 436, 439 (1985); *accord* 42 Pa.C.S. § 6321–6322. Therefore, Appellant's claim is facially cognizable under the PCRA.[11]

Concerning Appellant's transfer request, a charge of murder is automatically within the jurisdiction of the criminal court. *See* Act of April 28, 1978, P.L. 202, No. 53, § 22 (defining delinquent act as not including the crime of murder); *see also Commonwealth v. Kocher,* 529 Pa. 303, 306, 602 A.2d 1308, 1310 (1992); *accord* 42 Pa.C.S. § 6302. Consequently, jurisdiction in the trial court was presumptively proper. *See Pyle,* 462 Pa. at 622–23, 342 A.2d at 106–07. Nevertheless, the Juvenile Act permits the transfer of a murder charge to the juvenile court system.

Despite Appellant's mental illness and commitment for treatment subsequent to the hearing involving the transfer request, he did not have a right to be adjudicated within the juvenile court system. Rather, there is no constitutional guarantee of special treatment for juvenile offenders, *see*

11. We have also explained that the truth determining language in Section 9543 of the PCRA must be read in conjunction with the directive in Section 9542 that the PCRA provide the exclusive avenue for achieving collateral relief, embracing all other similar remedies. *See Commonwealth v. Lantzy,* 558 Pa. 214, 223 n. 4, 736 A.2d 564, 570 n. 4 (1999); *accord Commonwealth v. Ginglardi,* 758 A.2d 193, 196–97 (Pa.Super.2000).

*Commonwealth v. Williams,* 514 Pa. 62, 71, 522 A.2d 1058, 1063 (1987); the statutory provision upon which Appellant relies merely provided considerations for the court in exercising its discretion as to whether a particular offense or set of offenses should be transferred to the juvenile court system. *See Pyle,* 462 Pa. at 619–20, 342 A.2d at 104–05. Here, although the court was not presented with testimony concerning Appellant's mental health background, it did receive evidence respecting his neglected childhood. At the same time, the court was also apprised of: Appellant's prior contact with the juvenile system for statutory rape, indecent exposure, indecent assault, simple assault, and involuntary deviate sexual intercourse; the nature of the present offenses; the fact that the charges stemming from Appellant's assault of M.O. had been transferred to adult court by another judge; and, significantly, the absence of an available facility that could assure Appellant's rehabilitation within the applicable time limitations. *Cf. id.* at 623–24, 342 A.2d at 107 (emphasizing juvenile treatment time limitations in declining to reverse the denial of a transfer request in a murder prosecution despite evidence of the defendant's mental health problems). Under such circumstances, we cannot conclude that Appellant was prejudiced by prior counsel's failure to renew the transfer motion or to raise the transfer issue on appeal.

 Appellant also contends that counsel was ineffective in failing to seek a competency hearing at each of the critical stages of trial and investigate, develop, and present available evidence of mental illness, brain damage, and incompetence. In addition, Appellant argues that: the competency procedure violated his constitutional right to due process, since an improper burden of proof was imposed; the trial court failed to hear and give effect to evidence of competency; and the competency evaluations were inadequate. The PCRA court determined that these issues were previously litigated, *see* 42 Pa.C.S. § 9543(a)(3); moreover, Appellant cannot circumvent such limitation by asserting ineffective assistance of counsel, or by asserting new theories of relief to support claims that have been litigated. *See Commonwealth v. Peterkin,* 538 Pa.

455, 460–61, 649 A.2d 121, 123 (1994). Relying upon *Commonwealth v. Miller*, 560 Pa. 500, 746 A.2d 592 (2000), Appellant maintains that the current issues have not been previously litigated, as they do not rest solely upon previously litigated evidence. In this regard, Appellant emphasizes that this Court did not consider counsel's ineffectiveness or certain additional facts evidencing Appellant's incompetence, for instance, the testimony of family members, the familial history of mental illness, and indications of mental illness in the reports of the mental health professionals who examined Appellant. On direct review, however, Appellant raised multiple challenges to the competency determination, contending that the decision was flawed, as the psychiatrists did not possess early reports concluding that Appellant was incompetent; that the court should have credited Dr. Blumberg's testimony during the second competency hearing; that he was incompetent as a result of the medication that he was taking; and that he was incompetent given Dr. Saul's diagnosis of schizophrenia. *See Hughes*, 521 Pa. at 436–37, 555 A.2d at 1270–71.

Moreover, Appellant's reliance upon *Miller* is misplaced. On direct appeal in *Miller*, the Court rejected a claim that evidence of the pregnancy of one of the victims should have been excluded, as its probative value was outweighed by its prejudicial effect. *See Commonwealth v. Miller*, 541 Pa. 531, 551, 664 A.2d 1310, 1320 (1995). The appellant in *Miller* had challenged the use of the evidence to establish a common scheme because he did not deny killing the victim and stipulated to her identity. *See id.* at 552, 664 A.2d at 1320. On collateral review, the appellant raised as an issue that the prosecutor had improperly interjected victim impact evidence into the trial by presenting testimony from the victim's mother which referenced, *inter alia*, the victim's pregnancy. *See Miller*, 560 Pa. at 519, 746 A.2d at 602. Although evidence concerning the pregnancy was included in the appellant's victim impact issue, the claim was distinct from that raised on direct appeal. *See id.* at 519 n. 9, 746 A.2d at 602 n. 9. Consequently, the reference in *Miller* that the claim did not

rest solely upon previously litigated evidence indicated that the issue was distinct. Here, absent an allegation of after-discovered evidence, Appellant cannot obtain further review of the prior competency determination by merely alleging the ineffectiveness of trial counsel and arguing that this Court failed to consider certain facts that were developed before it at the time of its review.

 That said, Appellant's constitutional claim involving the burden of proof used in evaluating his competency, although related to the prior competency determination, does not concern the nature of the proof, but rather, the standard employed in evaluating such evidence. As such, the claim implicates a different issue, the merits of which were not addressed on direct appeal. Regarding waiver, although this issue could have been raised at the prior competency hearings or on direct appeal, Appellant contends, *inter alia*, that competency issues cannot be waived. In the alternative, Appellant casts the issue in terms of ineffective assistance of counsel and argues that any waiver is overcome. While the Court is closely divided on the question of whether a competency claim may be waived, *see Commonwealth v. Santiago*, 579 Pa. 46, 63–64, 855 A.2d 682, 692 (2004) (Opinion Announcing the Judgment of the Court) (stating, *inter alia*, that competency issues are not subject to the PCRA's waiver rule),[12] we need not settle this issue presently, as Appellant's claim may be resolved upon a merits analysis.[13]

12. *Accord Commonwealth v. Nelson*, 489 Pa. 491, 496–97, 414 A.2d 998, 1000–01 (1980) (plurality opinion) (declining to find a competency issue waived under the Post–Conviction Hearing Act).

13. Assuming that the claim is waived and may only be reached via a challenge to prior counsel's stewardship, as arguable merit is a prerequisite to demonstrating a claim of ineffectiveness, resolution of the claim on this basis is not inconsistent with our jurisprudence. *See generally McGill*, 574 Pa. at 588, 832 A.2d at 1023 (explaining that, if a PCRA petitioner fails to satisfy any part of the standard for relief, his claim must fail). In characterizing our reasoning as an application of the former relaxed waiver doctrine, the responsive opinion of Mr. Justice Castille does not acknowledge the expressly stated ineffectiveness dynamic of Appellant's claim. *See* Concurring and Dissenting Opinion, *op.* at 815–16. As has been developed extensively in recent opinions, ineffectiveness claims are asserted as a means of overcoming

At the time of Appellant's trial, a defendant alleging incompetence was required to establish such fact by clear and convincing evidence. *See* Act of July 9, 1976, P.L. 817, No. 143, § 403(a); *Commonwealth v. Banks*, 513 Pa. 318, 341, 521 A.2d 1, 12 (1987).[14] Fifteen years after Appellant's trial, and seven years after his conviction became final on direct appeal, the United States Supreme Court addressed the appropriate standard for a finding of incompetence in *Cooper v. Oklahoma*, 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996). There, the Court held that an Oklahoma statute requiring a defendant to demonstrate his incompetence by clear and convincing evidence violated the Due Process Clause of the Fourteenth Amendment of the United States Constitution. *See id.* at 369, 116 S.Ct. at 1384. In so holding, the Court acknowledged that

waiver; therefore, the mere assertion that the underlying claim is waived is insufficient to resolve all of Appellant's competency-related claims that are advanced in this appeal.

Additionally, although the practice is apparently objectionable to Mr. Justice Castille, *see* Concurring and Dissenting Opinion, *op.* at 815–17, other courts have had no difficulty with obviating resolution of waiver arguments by reference to the merits of an underlying claim where, as here, the claim is without merit. *See, e.g., United States v. Ward*, 211 F.3d 356, 364 (7th Cir.2000) ("In the present case, we need not decide the waiver issue because [the defendant's] claim fails on the merits."); *United States v. Nyhuis*, 8 F.3d 731, 744 (11th Cir.1993) ("We need not decide the waiver question because we find [the defendant's] contention to be without merit."); *McConnaughey v. United States*, 804 A.2d 334, 341 n. 8 (D.C.Ct.App.2002) (same); *People v. Hall*, 59 Cal.App.4th 972, 69 Cal.Rptr.2d 826, 833 (1997) (same). Obviously, the waiver question would need to be addressed if relief were otherwise available; thus, we are not, as the Concurring and Dissenting Opinion purports, "allow[ing] a new rule of law to impeach the fairness of a trial and a judgment that has become final." Concurring and Dissenting Opinion, *op.* at 816. In fact, as developed above, we have expressly declined to disturb the verdict relative to this claim.

14. Appellant maintains that the trial court applied a clear and convincing standard. Although the trial court cited to the former standard set forth in Section 403(a) of the Mental Health Procedures Act, 50 P.S. § 7403(a), the opinion denying post-verdict motions is less than clear on this point, instead incorrectly indicating that the decision respecting competency must be "supported by clear and convincing evidence found in the record." Trial Court Op. at 16 (Nov. 16, 1986). This Court, however, correctly referred to the standard in reviewing Appellant's other competency challenges. *See Hughes*, 521 Pa. at 436, 555 A.2d at 1270.

it had recently determined in *Medina v. California*, 505 U.S. 437, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992), that a state could properly presume a defendant competent and require him to prove otherwise by a preponderance of the evidence, but that the degree of proof associated with this burden had not been previously addressed. *See Cooper* at 355, 116 S.Ct. at 1377. The Court proceeded to observe that, historically, a preponderance standard had been applied in such circumstances, and that the clear and convincing standard was of recent origin, with only four states imposing the heightened burden of proof. *See id.* at 357–61, 116 S.Ct. at 1378–80.[15] Emphasizing the importance of a defendant's competence in ensuring a fair trial, the Court reasoned that a heightened standard would permit the trial of a defendant who has demonstrated that he is more likely than not incompetent, and the imposition of a more stringent burden upon the defendant would increase the risk of an erroneous decision. *See id.* at 354, 363–64, 116 S.Ct. at 1376, 1381.

■■■■■ Application of *Cooper* to Appellant's case, however, requires consideration of whether the ruling may be applied retroactively. In general, new rulings involving substantive criminal law are applied retroactively on collateral review, *see Schriro v. Summerlin*, 542 U.S. 348, ——, 124 S.Ct. 2519, 2522, 159 L.Ed.2d 442 (2004), whereas new procedural rulings of constitutional dimension are not. *See Teague v. Lane*, 489 U.S. 288, 310, 109 S.Ct. 1060, 1075, 103 L.Ed.2d 334 (1989) (plurality opinion); *Commonwealth v. Blystone*, 555 Pa. 565, 576, 725 A.2d 1197, 1203 (1999). For purposes of retroactivity analysis, the definition of procedural has been broadly interpreted to encompass rulings "that regulate only the *manner of determining* the defendant's culpability...." *Schriro*, 542 U.S. at ——, 124 S.Ct. at 2523 (emphasis in original). By contrast, a new rule is considered one of substance only "if it alters the range of conduct or the class of persons that the law

15. The Court identified Connecticut, Oklahoma, Pennsylvania, and Rhode Island. *See id.* at 360 n. 16, 116 S.Ct. at 1380 n. 16. Louisiana also employed a clear and convincing standard. *See State v. Gaines*, 701 So.2d 688, 690 (La.Ct.App.1997).

punishes." *Id.* Given these definitions, the burden of proof to support a finding of incompetence falls more directly in the category of rules implicating the manner in which a defendant's guilt is determined and is, therefore, procedural. *Accord id.* at ——, 124 S.Ct. at 2523–24; *cf. In re Winship*, 397 U.S. 358, 362–63, 90 S.Ct. 1068, 1071–72, 25 L.Ed.2d 368 (1970) (characterizing the reasonable doubt standard as a rule of criminal procedure).

The ruling must also be "new," which is defined as one that "breaks new ground or imposes a new obligation on the States or Federal Government," or, stated otherwise, where "the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Teague*, 489 U.S. at 301, 109 S.Ct. at 1070 (emphasis in original). In determining whether a rule is new, it is examined in the context of the legal setting existing at the time the conviction became final "to determine whether a state court considering [the] claim ... would have felt compelled by existing precedent to conclude that the rule ... was required by the Constitution." *Saffle v. Parks*, 494 U.S. 484, 488, 110 S.Ct. 1257, 1260, 108 L.Ed.2d 415 (1990). Under this standard, "gradual developments in the law over which reasonable jurists may disagree" are treated as new. *Sawyer v. Smith*, 497 U.S. 227, 234, 110 S.Ct. 2822, 2827, 111 L.Ed.2d 193 (1990).

In this regard, some courts have declined to treat *Cooper* as announcing a new rule, emphasizing the acknowledgment in the opinion that both historical and more recent practice supported a preponderance standard. *See, e.g., Gaines*, 701 So.2d at 693; *Walker v. State*, 933 P.2d 327, 339 (Okla.Crim.App.1997). At the same time, the decision has also been characterized as a new rule, since it was not directed by precedent. *See Attica v. Frank*, No. Civ.A.99–5113, 2001 WL 827455, at *5 (E.D.Pa. July 11, 2001) (explaining that the Court in *Cooper* distinguished the issue from that addressed previously in *Medina*). Indeed, the *Attica* court noted the absence of any previous indication from either the United States Supreme Court or the federal courts of appeal to the effect that a clear and convincing standard would not with-

stand constitutional muster. *See id.* (citing *Sheley v. Single-tary,* 955 F.2d 1434, 1440 (11th Cir.1992); *Holmes v. King,* 709 F.2d 965, 967 (5th Cir.1983)).[16] As the issue in *Cooper* had not been previously addressed, and as the holding was not dictated by precedent, for purposes of *Teague,* it constituted a new rule.

*Teague,* nevertheless, provides two exceptions to the retroactivity bar. The first applies where a new "rule places a class of private conduct beyond the power of the State to proscribe or addresses 'a substantive categorical guarante[e] accorded by the Constitution,' such as a rule 'prohibiting a certain category of punishment for a class of defendants because of their status or offense.'" *Saffle,* 494 U.S. at 494, 110 S.Ct. at 1263 (citations omitted).[17] This exception does not apply here, as the ruling in *Cooper* did not involve either the decriminalization of a class of conduct, *see, e.g., Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), or the prohibition against the punishment of a class of persons, such as, the mentally retarded. *See, e.g., Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

The second exception concerns "watershed rules of criminal procedure," *Saffle,* 494 U.S. at 495, 110 S.Ct. at 1264, and to be implicated, "[i]nfringement of the rule must 'seriously diminish the likelihood of obtaining an accurate conviction,' and the rule must 'alter our understanding of the *bedrock procedural elements*' essential to the fairness of a proceeding." *Tyler v.*

**16.** The employment of a clear and convincing standard for competency determinations may have resulted from the provision in Section 402(b) of the Mental Health Procedures Act, 50 P.S. § 7402(b), permitting a court to involuntarily commit for treatment a defendant found incompetent to stand trial, and the fact that court-ordered involuntary treatment is subject to a clear and convincing standard. *See* 50 P.S. § 7304(f). In the context of an involuntary commitment, a clear and convincing standard is constitutionally appropriate. *See Addington v. Texas,* 441 U.S. 418, 433, 99 S.Ct. 1804, 1813, 60 L.Ed.2d 323 (1979).

**17.** This exception overlaps with the preliminary determination of whether the new rule involves an aspect of substantive criminal law. *See generally Palmer v. Clarke,* 293 F.Supp.2d 1011, 1053 n. 36 (D.Neb. 2003) (noting that some courts treat the substantive verses procedural question as a threshold matter, while others conflate it with the inquiry under the first *Teague* exception).

*Cain,* 533 U.S. 656, 665, 121 S.Ct. 2478, 2484, 150 L.Ed.2d 632 (2001) (plurality opinion) (emphasis in original) (citation and internal quotations omitted). While the United States Supreme Court has acknowledged the difficulty in denoting the contours of this exception, *see Saffle,* 494 U.S. at 495, 110 S.Ct. at 1264, as explained in *Attica,* a watershed rule affects a large class of cases and,[18] thus far, only one rule has been identified as meeting such criteria, namely, the right to counsel. *See Attica,* 2001 WL 827455, at *6. Moreover, where a defendant has had the benefit of a less stringent standard protecting the same interest, the new constitutional standard has not been retroactively applied. *See id.* (citing *Levan v. United States,* 128 F.Supp.2d 270, 278 (E.D.Pa.2001)).

 Presently, as recognized in *Attica,* Appellant was protected by the constitutional prohibition against the trial of an incompetent, *see id.* (citing *Pate v. Robinson,* 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815 (1966)), and, as important, a statutory framework for making such determination. *See generally* Act of July 9, 1976, P.L. 817, No. 143, §§ 402–403. We recognize that the accuracy of the competency determination is affected by the burden of proof, and that a defendant's competency affects his ability to exercise rights associated with a fair trial, *see Cooper,* 517 U.S. at 362–64, 116 S.Ct. at 1381; nevertheless, we do not believe that the change in the burden of proof constitutes a watershed rule as the United States Supreme Court has defined it, that seriously undermines the reliability of the trial's outcome and alters bedrock procedural elements. *Accord Attica,* 2001 WL 827455, at *6; *cf. Tyler,* 533 U.S. at 665, 121 S.Ct. at 2484 (declining to treat the rule regarding an unconstitutional reasonable doubt instruction announced in *Cage v. Louisiana,* 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), as satisfying the second exception in *Teague* for retroactivity).[19] Ac-

18. The change in the burden of proof, by contrast, was of limited application, affecting only a narrow category of cases in those few jurisdictions that had adopted a heightened standard. *See Attica,* 2001 WL 827455, at *6.

19. As noted, Appellant alternatively framed this claim in terms of ineffective assistance; however, counsel cannot be held ineffective for

cordingly, *Cooper* is not retroactively applicable to Appellant's case.[20]

■ In his remaining pre-trial claim, Appellant argues that his confessions were involuntary, and that he did not validly waive his constitutional rights. On direct appeal, Appellant specifically challenged the voluntariness of his confessions and argued that he did not knowingly and intelligently waive his constitutional rights. *See Hughes*, 521 Pa. at 442–44, 555 A.2d at 1273–75. This claim, therefore, has been previously litigated.

### Guilt Phase

■ Appellant asserts that he was tried while involuntarily drugged with psychotropic medication in violation of his right to due process of law. Based upon *Riggins v. Nevada*, 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992), Appellant argues that the compelled administration of psychotropic medication interfered with his liberty interest, and that to justify such intrusion, the Commonwealth was required to demonstrate that there was no significant risk that the medication

failing to anticipate a change in the law. *See Commonwealth v. Gibson*, 547 Pa. 71, 105, 688 A.2d 1152, 1169 (1997).

**20.** A premise of the Concurring and Dissenting Opinion's criticism of the above analysis is that we are indulging in a pretense that Appellant did not waive his right to vindicate the *Cooper* rule on direct appeal. *See* Concurring and Dissenting Opinion, *op.* at 817 (Castille, J.). The criticism is undermined, however, by the fact that we engage in no such pretense. Rather, in part because Appellant has attached a derivative ineffectiveness claim to his *Cooper* argument, and in part for prudential reasons, we have simply determined that the claim is without merit rather than addressing the waiver arguments, an approach which clearly has been sanctioned by this Court, *see, e.g., McGill*, 574 Pa. at 588, 832 A.2d at 1023, and, again, is commonly applied in other jurisdictions. *See supra* note 13. Moreover, the Concurring and Dissenting Opinion fails to acknowledge the material difference between the salient analysis concerning whether a petitioner has waived a claim, and the related but discrete question of whether and to what extent new, constitutionally based rules of criminal procedure are to be retroactively applied under *Teague*. *See generally Bousley v. Brooks*, 97 F.3d 284, 287 n. 2 (8th Cir.1996) (noting the distinction between waiver and retroactivity in the context of collateral review), *rev'd on other grounds, Bousley v. United States*, 523 U.S. 614, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998).

would impair or alter, in any material way, his capacity or willingness to react to the testimony at trial or to assist counsel. According to Appellant, the failure of counsel to object to the drugging, inform the jury about the effects of the medication, and raise the issue on appeal constituted ineffective assistance.[21]

In *Riggins,* the defendant moved for an order to suspend the administration of the antipsychotic medication, arguing that, in support of his insanity defense he had a right to show the jury his "true mental state." *See Riggins,* 504 U.S. at 130, 112 S.Ct. at 1812. Following a hearing, the court denied the motion and the defendant proceeded to trial, where he presented an insanity defense and testified in his own behalf. The United States Supreme Court acknowledged that the Fourteenth Amendment's Due Process Clause protects against the involuntary administration of antipsychotic drugs. *See id.* at 134, 112 S.Ct. at 1814. The Court also noted that the prosecution can satisfy due process concerns where the medication is "medically appropriate and, considering less intrusive alternatives, essential for the sake of [a defendant's] own safety or the safety of others." *See id.* at 135, 112 S.Ct. at 1815 (citations omitted). In a concurring opinion, Justice Kennedy explained that drugs can prejudice a defendant by changing his demeanor in the courtroom and interfering with his ability to assist counsel. *See id.* at 142, 112 S.Ct. at 1818–19 (Kennedy, J., concurring).

■ Assuming that the ruling in *Riggins* is retroactively applicable,[22] there is no indication in Appellant's PCRA petition or brief that the psychotropic medication that he was receiving was administered involuntarily. Rather, Appellant relies upon the fact that, following the second hearing concern-

---

21. The PCRA court treated this issue as previously litigated, explaining that Appellant had argued on direct appeal that his taking of Thorazine and Elavil demonstrated his lack of competency. Although related, the issue of competency based upon asserted mental health impairments is distinct from that involving whether Appellant was involuntarily medicated so as to be competent to stand trial. Therefore, the issue has not been previously litigated.

22. *See supra* Op. at pp. 780–81.

ing his competency, the prosecutor requested that Appellant remain on his medication. The request followed testimony by Dr. Saul indicating that it would be medically inappropriate to discontinue Appellant's medication during the stressful circumstances surrounding a trial. Notably, Appellant had been taking Thorazine, an antipsychotic medication, for a number of months prior to the second competency hearing; he had advised his physicians that he felt better taking such medication; Dr. Camiel testified that the medication did not affect Appellant's ability to communicate during the psychiatric evaluation; and at no point does the record indicate that Appellant requested that such medication be discontinued. Moreover, Appellant does not assert that he advised counsel of a desire to discontinue taking the medication and, unlike *Riggins*, Appellant did not present a mental infirmity defense at trial. Although Appellant argues that the prosecutor emphasized Appellant's calm affect to the jury in arguing for the death penalty,[23] he does not contend that the medication interfered with his ability to communicate with counsel. Absent an offer from Appellant explaining why the maintenance of his medication was involuntary, we will not assume that counsel was ineffective for failing to object. *See Commonwealth v. O'Donnell*, 559 Pa. 320, 341, 740 A.2d 198, 210 (1999).[24]

23. The prosecutor's remarks respecting a calm demeanor were actually addressed to mitigation evidence of Appellant's age and maturity.

24. Our decision in this regard does not "nullify the PCRA's waiver provision" as Mr. Justice Castille indicates, *see* Concurring and Dissenting Opinion, *op.* at 817, since relief is not being afforded on Appellant's claim. Rather, we have merely denied the claim on a different basis from that which the responsive opinion would prefer, namely, a holding that *Riggins* is not to be retroactively applied under a *Teague* analysis. Our approach in this regard, however, is consistent with the general precept that the Court will not resolve debatable constitutional issues in the context of claims that may be resolved on alternative grounds, *see, e.g., In re Fiori*, 543 Pa. 592, 600, 673 A.2d 905, 909 (1996) (citing *Rescue Army v. Mun. Court*, 331 U.S. 549, 568–69, 67 S.Ct. 1409, 1419–20, 91 L.Ed. 1666 (1947)); *Commonwealth v. Dillworth*, 431 Pa. 479, 483, 246 A.2d 859, 861 (1968), and is in alignment with the practice of many courts that have been confronted with *Teague*-based retroactivity questions. *See, e.g., Wallace v. Parke*, No. 96–1245, 1997 WL 413510, at *2 (7th Cir. Jul. 15, 1997) (declining to consider retroactive application of *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), because the habeas petitioner's claim failed on the merits);

■ Next, Appellant contends that prior counsel was ineffective for failing to seek transcription of the *voir dire* proceedings for post-trial motions and direct appeal, to which he is entitled, and as a result, his direct appeal rights with respect to all jury selection issues should be reinstated *nunc pro tunc*. Alternatively, Appellant maintains that, to the extent that the transcripts no longer exist and cannot be adequately re-created, he is entitled to a new trial.[25]

Responding to Appellant's transcript request, the PCRA court proceeded in accordance with Appellate Rule 1923, which permits a party to prepare a statement of the evidence or proceedings from the best available means, including his recollection, where a transcript is unavailable. *See* Pa.R.A.P. 1923. The PCRA court also directed that such statement should be served upon the Commonwealth, and after any objections or proposed amendments, it was to be filed with the court for approval. The PCRA court cautioned, however, that the failure to file such a statement would result in a waiver of any issues based upon the unavailable portions of the transcript. Appellant did not timely file a statement and, instead, submitted a response, explaining that a statement could not be prepared because trial counsel had no independent recollection of the proceedings, Appellant suffers from severe mental

*United States v. Pavlico,* 961 F.2d 440, 448 (4th Cir.1992) (declining to engage in retroactivity analysis of *Harmelin v. Michigan,* 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), based on the conclusion that the petitioner's *Harmelin* claim lacked merit); *Clisby v. Jones,* 960 F.2d 925, 928 n. 6 (11th Cir.1992) (indicating that it was unnecessary to consider whether the requirements of *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), applied retroactively to a postconviction petitioner's claim, as the claim failed on its merits); *Sperow v. Walls,* 182 F.Supp.2d 695, 699–700 (C.D.Ill.2002) (declining to consider the argument concerning whether *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), is retroactively applicable, in light of the failure of the post-conviction petitioner's *Apprendi* claim on its merits); *Caron v. United States,* 183 F.Supp.2d 149, 153 (D.Mass.2001) (same); *DeFeo v. United States,* 153 F.Supp.2d 453, 460–61 (S.D.N.Y.2001) (same); *cf. Correia v. Rowland,* 263 Conn. 453, 820 A.2d 1009, 1019 n. 16 (2003) (declining to review retroactivity issues in light of a merits disposition of a post-conviction petitioner's claim).

25. Apparently, the court reporter for the jury selection phase of the trial could not be identified.

illness, the trial judge is deceased, and the only available means of recreating the proceedings would be through discovery of the prosecutor's notes from the jury selection proceedings. The PCRA court did not address Appellant's response, finding that any issues had been waived by virtue of Appellant's failure to reconstruct the record.

 Appellant premises this claim upon *Commonwealth v. Shields*, 477 Pa. 105, 383 A.2d 844 (1978), wherein the Court explained that, to adequately assure the right to appeal, a defendant must be provided with a complete transcript or some "other equivalent picture of the trial proceedings." *Id.* at 108, 383 A.2d at 846. A defendant may be entitled to a new trial where meaningful appellate review is impeded by the absence of a transcript or another equivalent method of recreating the proceedings. *See id. Shields*, however, was decided in the context of a direct appeal and where defense counsel had asserted in post-verdict motions that the prosecutor made prejudicial and inflammatory remarks during his closing argument. *See id.* at 107–08, 109, 111, 383 A.2d at 845, 846, 847. Here, Appellant's claim is made in the context of collateral review and as a challenge to the stewardship of trial/appellate counsel. Although Appellant speculated in the PCRA court that a review of the record of the *voir dire* proceedings may indicate, *inter alia*, instances of racial discrimination during the jury selection process, in contrast to *Shields*, Appellant does not delineate any identifiable and specific error for review. Given the presumption of effectiveness that attaches to prior counsel's actions, and as it is Appellant's burden to demonstrate eligibility for relief under the PCRA, mere conjecture does not establish an entitlement to relief. *Accord Commonwealth v. Johnson*, 312 Pa.Super. 484, 494, 459 A.2d 5, 10 (1983).

Appellant additionally claims that prior counsel was ineffective for not arguing that a limiting instruction was required with respect to other crimes evidence introduced during the trial, namely, that involving the sexual assault and attempted

murder of M.O.[26] In the present matter, contrary to Appellant's representation, the court issued a lengthy instruction concerning other crimes evidence in its charge, specifically cautioning the jurors both as to the limited purpose of the evidence, and that it must not be treated as evidence of Appellant's bad character or criminal predisposition.[27] In

26. The PCRA court deemed this issue previously litigated, noting that the admissibility of the other crimes evidence was raised on direct appeal. Appellant's PCRA claim, however, is not predicated on the admissibility of the other crimes evidence, but rather, upon the absence of a jury instruction respecting its relevancy. *See generally Commonwealth v. Billa*, 521 Pa. 168, 179–80, 555 A.2d 835, 841–42 (1989) (cautioning that, because of the prejudicial effect of other crimes evidence, generally its admission must be accompanied by a cautionary instruction, explaining the limited purpose connected with such proof).

27. In pertinent part, the court emphasized:

This evidence must not be considered by you in any other way than the purpose for which I just stated: to determine the identity of the perpetrator of the Rochelle Graham criminal acts, that is, to establish or show the identity of the person who committed the offenses in this case which is being tried.

\* \* \*

Notwithstanding the fact that I have ruled that the evidence of unrelated charges is admissible as evidence in this case, relevant only to the issue of identity of the person who committed the crimes in this case on trial, you are to accord the defendant the full and complete benefit of the presumption of innocence during your deliberations. You are not to regard the evidence of unrelated crimes, which is admissible, irrespective of whether or not a defendant was ever tried and convicted for such unrelated crimes, as showing that the defendant is a person of bad character or criminal tendencies, from which you might be inclined to infer guilt.

\* \* \*

Here, this Court's admitting such evidence of unrelated charges was within a well-recognized exception to the general rule which bars the admission of evidence of unrelated crimes independent of those for which the defendant is on trial. Evidence introduced through the [M.O.] ... testimony and related witnesses was offered to establish identity or to show that the defendant is the person who committed the charges involved in this case.

\* \* \*

I want to repeat: Consider the evidence of unrelated crimes in the manner I have outlined for you. Notwithstanding the fact that I admitted such evidence, don't allow the admission of such evidence to erode the defendant's presumption of innocence. Don't allow it to create it in your minds that he is a person of bad character. Don't allow it to create a belief in your minds that the defendant is predisposed to crime or that, since he could have committed the

light of these instructions, counsel had no reason to raise such issue on appeal, and Appellant's ineffectiveness claim is without merit.

Appellant also maintains that prior counsel was ineffective for failing to raise as an issue on direct appeal the trial court's ruling that permitted the Commonwealth to cross-examine a psychologist, Dr. Wilson, and elicit that Appellant had admitted setting a fire in an old house on the date of the offense. Appellant contends that Dr. Wilson's examination was state-initiated, and that he was not advised of his constitutional rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

By way of background, following the defense case, the Commonwealth sought to call Dr. Wilson as a rebuttal witness respecting Appellant's ability to understand the *Miranda* warnings and Appellant's admission to both killing Ms. Graham and starting a fire inside a vacant house on the day of the crime. Counsel for Appellant objected to Dr. Wilson's testimony concerning Appellant's admissions, arguing that he had not been provided with such statements during discovery; that any statements made during the course of a court-ordered interview in the context of a juvenile proceeding would be confidential; and the questioning of Appellant without providing *Miranda* warnings violated his Fifth Amendment right to be free from self-incrimination and, as he was represented by counsel, his Sixth Amendment right to counsel. After conducting a hearing, the trial court suppressed Appellant's admission to having killed Ms. Graham, but ruled that the Commonwealth could introduce his statement that he had been playing with matches on the date of the murder and that an old house burned.

Although the Commonwealth elected not to call Dr. Wilson as part of its rebuttal presentation, trial counsel opted to call her on surrebuttal to dispute the Commonwealth's evidence of Appellant's literacy. In this regard, trial counsel elicited that Appellant read at a second grade level, which Dr. Wilson

incidence in the [M.O.] ... testimony, he must have, of necessity, committed the charges in this case.

acknowledged rendered him functionally illiterate; that Appellant's comprehension, social judgment, and reasoning were all deficient, concrete, and stereotypically along the lines of that of a young child; and that mild brain damage could not be conclusively ruled out. In addition, trial counsel questioned Dr. Wilson as to whether she had been subpoenaed by the Commonwealth and had spoken with the prosecutor prior to coming into the courtroom. In response to this inquiry, the Commonwealth, over objection, brought out that Appellant had admitted during Dr. Wilson's interview to having set a fire on March 1, 1979, while playing with matches, and that an old house had burned. The trial court ruled that the Commonwealth's question was proper, as trial counsel's questioning suggested that the Commonwealth had decided not to present Dr. Wilson's testimony because it would have been unfavorable.

■ Relying upon *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), Appellant maintains that his statements to Dr. Wilson were inadmissible, as he was not issued *Miranda* warnings and counsel was not present. According to Appellant, *Estelle* provided clear authority on this point, and prior counsel was ineffective for failing to raise the issue on appeal. In *Estelle*, a defendant in a capital case was subject to a court-ordered pretrial psychiatric examination to determine his competency. *See id.* at 456–57, 101 S.Ct. at 1870. The psychiatric report determined that the defendant was competent, and also indicated that he was "a severe sociopath." *Id.* at 457, 458–59, 101 S.Ct. at 1870, 1871. During the penalty hearing, the prosecution sought to introduce opinion testimony from the psychiatrist indicating the defendant's future dangerousness, one of three issues the jury was required to decide in determining whether to impose the death penalty. *See id.* at 457–59, 101 S.Ct. at 1870–71. Notably, in *Estelle*, the defendant had not placed at issue his competency to stand trial or his sanity at the time of the offense. *See id.* at 457 n. 1, 101 S.Ct. at 1870 n. 1. The Court ruled that the use of the defendant's unwarned statements to the psychiatrist for purposes of establishing future dangerousness infringed

upon the defendant's Fifth Amendment right against self-incrimination and his Sixth Amendment right to counsel. *See id.* at 469, 101 S.Ct. at 1876. In so ruling, the Court explained that "[a] criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." *Id.* at 468, 101 S.Ct. at 1876.

In the present matter, Appellant did not initiate the psychological evaluation with Dr. Wilson and did not present a mental infirmity defense during the trial. Nevertheless, trial counsel elicited Dr. Wilson's findings and opinions regarding Appellant's cognitive functioning and comprehension, including an indication that he may suffer from brain damage. For this reason, Appellant's circumstance does not fall squarely within *Estelle's* prohibition. Indeed, as the trial court observed, prior counsel sought to establish an inference that the Commonwealth had declined to call Dr. Wilson because she was an unfavorable witness, even though it had initially subpoenaed her, thereby bolstering her credibility as a witness called by the defense. Having attempted to gain such advantage, trial counsel opened the door to questioning surrounding the reason for the Commonwealth's decision to subpoena her, namely, the existence of incriminating statements made by Appellant.[28] Consequently, prior counsel cannot be deemed ineffective for failing to challenge the prosecutor's cross-examination of Dr. Wilson on appeal.

Appellant maintains that prior counsel was ineffective for failing to investigate, develop, and present the defenses of insanity and diminished capacity. In support, Appellant has included affidavits from a psychologist, Patricia Fleming, Ph.D., and a psychiatrist, Robert A. Fox, M.D., stating that Appellant suffers from serious psychiatric and cognitive impairments, and that these impairments existed at the time of the offenses and prevented him from knowing the nature and

28. Although the strategic decision may have been questionable, Appellant has not challenged counsel's assistance in this respect.

quality of his actions or, if he did know, that he did not know that what he was doing was wrong. In addition, Appellant's mental health experts opined that he suffered from a diminished capacity, and that his mental and cognitive impairments significantly diminished his ability to premeditate and form a specific intent to kill.[29]

The PCRA court concluded that a defense of insanity or diminished capacity would have been inconsistent with Appellant's claim of innocence and, accordingly, that counsel could not be faulted for making a strategic decision to forego a mental infirmity defense given Appellant's testimony.[30] A defense of insanity acknowledges commission of the act by the defendant, while maintaining the absence of legal culpability. *See Commonwealth v. Cross*, 535 Pa. 38, 43, 634 A.2d 173, 175 (1993). Similarly, a defense of diminished capacity admits liability, while contesting the degree of culpability based upon a defendant's inability to possess a particular mental state. *See Commonwealth v. Jones*, 539 Pa. 222, 238, 651 A.2d 1101, 1109 (1994). Where a defendant has testified

**29.** Preliminarily, the PCRA court noted that the merits of the claim related to the insanity defense need not be addressed, reasoning that, as Appellant was found competent to stand trial, the Commonwealth could have easily rebutted any contention of insanity. The standards relative to competency to stand trial and those necessary to establish insanity, however, are distinct. *See Commonwealth v. Bruno*, 466 Pa. 245, 252 n. 3, 352 A.2d 40, 44 n. 3 (1976); *Commonwealth v. Melton*, 465 Pa. 529, 534, 351 A.2d 221, 224 (1976). A competency determination involves an assessment of a defendant's ability, at the time of trial, to consult with counsel, participate in his defense, and understand the nature of the proceedings. *See* 50 P.S. § 7402(a); *Commonwealth v. Appel*, 547 Pa. 171, 187–88, 689 A.2d 891, 899 (1997). By contrast, an insanity defense focuses upon a defendant's capacity, at the time of the offense, to understand the nature and quality of his actions or whether he knew that his actions were wrong. *See* 18 Pa.C.S. § 315(b). Thus, the PCRA court erred in viewing the competency determination as necessarily negating a defense of insanity.

**30.** Notably, the PCRA court's conclusion that counsel's actions were premised upon strategic considerations was made without the benefit of a hearing affording an opportunity for counsel to explain the basis for his decision. Counsel had retained a mental health expert, Dr. Blumberg, for purposes of the competency issue and, during the second competency hearing, indicated to the court that Dr. Blumberg would also be examining Appellant for purposes of a potential defense.

at trial and has denied having committed a crime, this Court has declined to deem counsel ineffective for failing to present a defense that would have been in conflict with his client's own testimony. *Commonwealth v. Paolello,* 542 Pa. 47, 78–79, 665 A.2d 439, 455 (1995); *see Cross,* 535 Pa. at 43–44, 634 A.2d at 175–76. Here, as Appellant specifically denied having committed the offenses, under this Court's precedent, counsel cannot be held ineffective for failing to present an inconsistent defense.

■ Appellant's remaining guilt-phase claim is that counsel rendered ineffective assistance in failing to object at trial and raise on appeal numerous errors respecting the jury instructions which, according to Appellant, violated his due process rights. In general, we will not evaluate the adequacy of the instructions based on isolated references; rather, the charge is reviewed as a whole, with deference accorded the trial court's discretion in phrasing its instructions. *See Commonwealth v. Gibson,* 553 Pa. 648, 665, 720 A.2d 473, 481 (1998).

■ Three of Appellant's claims involve the trial court's discussion of reasonable doubt and the presumption of innocence. First, Appellant argues that the court erred in advising the jurors that they could find Appellant guilty based upon the Commonwealth's evidence alone, if it was sufficient, without regard to the defense evidence. In so stating, Appellant asserts that the court undermined his due process right to present evidence in his own defense and relieved the Commonwealth of its burden of proof. The trial court's explanation was in the context of the following:

> In your deliberations you can find a reasonable doubt of the defendant's guilt by appraising the defendant's evidence alone, the Commonwealth's evidence alone, or/and admixture (sic) or combination of the evidence for the prosecution or the defense.

> Most certainly, under his constitutional right to due process according to the law, the defendant has a right to present evidence in his own behalf, and to present evidence at trial,

and such evidence, if he does present it, is not to create in your minds that he has a burden of proof in the case but you are to weigh such evidence in determining whether or not there is a reasonable doubt in the case.

Of equal importance, on the other hand, after analyzing the Commonwealth's evidence alone, you can find that it was sufficient to establish the defendant's guilt beyond a reasonable doubt with respect to each and every element of each and every charge of which this defendant stands accused here at trial, provided you restrict your evaluation to the Commonwealth's evidence and the Commonwealth's evidence alone.

Bear in mind that this burden upon the Commonwealth in proving the defendant's guilt requires the Commonwealth to prove each and every element, each and every factual part necessary to make out the crime charged, and this proof must be beyond a reasonable doubt.

\* \* \*

The yoke of proof remains upon the Commonwealth throughout the entire trial of the case, until such time as the jury, after deliberations and after consideration of all of the evidence, the arguments of counsel, and the present instructions or final charge of the Court, concludes that the defendant is guilty of the crime charged beyond a reasonable doubt.

Although the reason for the court's reference to analyzing the Commonwealth's evidence alone is unclear, the trial court repeatedly stressed before the remarks at issue and thereafter that the jury should consider Appellant's evidence or all of the evidence before arriving at a verdict. Indeed, the court specifically referenced the defense evidence in explaining to the jury that they were to consider such proof in determining whether or not the defendant's guilt had been established beyond a reasonable doubt. Consequently, we decline to conclude that Appellant was prejudiced by prior counsel's omission.

■ Next, Appellant contends that the trial court improperly characterized reasonable doubt as being substantial, one that clouds the judgment, and much more serious than a possible doubt.[31] Citing *Cage*, 498 U.S. at 39, 111 S.Ct. at 328, Appellant maintains that the trial court's definition of reasonable doubt unconstitutionally lessened the Commonwealth's burden of proof. In relevant part, the reasonable doubt charge consisted of the following:

> A reasonable doubt is such a doubt that would cause a reasonably prudent, careful, sensible person to pause, hesitate, and restrain himself or herself before acting upon a matter of highest importance in his or her own affairs.

> * * *

> A doubt, to be reasonable, must be one which fairly strikes a conscientious mind and clouds the judgment. However, it is not such a doubt as one might dig up, ferret up, or conjure up or summon up out of oblivion or out of the norm for the purpose of escaping the consequences of an unpleasant verdict, but it is a doubt which is reasonable and an honest and real doubt fairly and with intellectual honesty arising out of the evidence that was presented or, just as importantly, out of the lack or absence of evidence that was presented with respect to some part or element of a crime.

> A reasonable doubt is not merely an imagined or fanciful or passing fancy that may come into the mind of a juror. It must be doubt arising from the evidence, which is substantial, well founded, and based on human reason and common sense.

> A reasonable doubt such as would be taken notice of by a juror in deciding a case or a question or issue in the case is of the same nature as a doubt that would cause a reasonable man or woman, in the conduct of his or her affairs, in a manner of importance to himself or herself, to stop, hesitate,

---

**31.** Although trial counsel objected to the court's reference to "substantial" in defining a reasonable doubt, the issue was not raised on direct appeal.

and seriously consider as to whether he should do a certain thing before finally acting.

Further, a reasonable doubt is something different and much more serious than a possible doubt. All of us live day to day and have lived in the course of our lives on a day-to-day basis, and we all know from our common learning and experience that all matters of knowledge and human affairs entail a possible doubt. A possible doubt arises in any and all things. It is almost impossible to possess any human knowledge or to come to any conclusion to a certainty beyond a possible doubt.

The Commonwealth is not required to prove its case beyond all doubt.

While it would have been preferable for the trial court to avoid using the term "substantial" in its reasonable doubt charge, *see Victor v. Nebraska,* 511 U.S. 1, 19–20, 114 S.Ct. 1239, 1250, 127 L.Ed.2d 583 (1994), the court's instruction is virtually identical to that which this Court upheld in both *Commonwealth v. Murphy,* 559 Pa. 71, 82–84, 739 A.2d 141, 147–48 (1999), and *Commonwealth v. Stokes,* 532 Pa. 242, 253–54, 615 A.2d 704, 709–10 (1992).[32] Here, as explained in *Murphy,* the reference to "substantial" was designed to distinguish the concept of reasonable doubt from that of an imaginary or possible doubt. *Accord Victor,* 511 U.S. at 20, 114 S.Ct. at 1250. Thus, trial counsel cannot be deemed ineffective for failing to challenge the reasonable doubt instruction on direct appeal.

██ Appellant also claims that the trial court's instruction on the presumption of innocence unconstitutionally suggested that such presumption could be overcome by a preponderance of the evidence. In particular, Appellant highlights the part of the court's charge stating that the presumption of innocence is dissolved when it is "outweighed by evidence to the contrary." The passage highlighted by Appellant was part of a lengthy explanation regarding reasonable doubt, in which the court

**32.** Notably, the same trial court judge presided in *Murphy, Stokes,* and the present matter.

repeatedly cautioned the jury that: the Commonwealth has the burden of proving the defendant guilty beyond a reasonable doubt; this burden never shifts; and the Commonwealth must establish each and every element and each and every fact necessary in its case beyond a reasonable doubt.[33] Accordingly, the court's charge respecting the presumption of innocence was adequate and cannot serve as a predicate for a claim of deficient stewardship of counsel.

■ Appellant next raises six separate challenges to the trial court's summary of the evidence, asserting that the court "marshaled the evidence in such a way as to encourage the jury to believe the Commonwealth's evidence; disbelieve the defense evidence; and find Appellant guilty." A trial court may refer to evidence or summarize testimony during its charge, provided that such commentary is impartial and does not invade the province of the jury. *See Commonwealth v. Pursell*, 555 Pa. 233, 275, 724 A.2d 293, 314 (1999). Here, as the trial court explained, the summary of the evidence was a means of refreshing the jurors' recollections because the trial

---

**33.** In pertinent part, the trial court explained:

The Commonwealth's burden of proving the defendant's guilt beyond a reasonable doubt never shifts. The yoke of proof remains upon the Commonwealth throughout the entire trial of the case, until such time as the jury, after deliberations and after consideration of all the evidence, the arguments of counsel, and the present instructions or final charge of this Court, concludes that the defendant is guilty of the crime or crimes charged beyond a reasonable doubt.

Further, there is a continuing presumption of innocence vested with the defendant not only at the beginning or commencement of the trial but throughout all the stages of the trial, even while you as jurors are deliberating. And the Commonwealth has a never-shifting burden to prove guilt beyond a reasonable doubt.

The presumption of innocence, as a matter of law, is founded upon the first principle of justice, and is not a mere form but a substantial part of the law.

As stated, the law presumes a defendant to be innocent of crime. Thus, a defendant, although he stands accused, begins a trial with no evidence against him. Thereafter, the law permits nothing but legal and competent evidence presented before the jury to be considered in support of any charges brought against the accused. So, the presumption of innocence itself, alone, is sufficient basis upon which to acquit a defendant unless you as jurors, upon an evaluation of the Commonwealth's evidence in the case, are satisfied beyond a reasonable doubt of the defendant's guilt.

had been lengthy. Prior to reviewing the evidence, the trial court advised the jury that: their recollections controlled; he was not the fact-finder; and during the summary, he may inadvertently omit certain testimony.

In this regard, Appellant asserts that the trial court unfairly characterized the testimony of Ophelia Moore, the victim's aunt, who indicated that, although Appellant had frequented her home prior to the offense, he had avoided contact with her afterward. According to the Commonwealth, such conduct suggested a consciousness of guilt. Addressing Ms. Moore's testimony, the trial court noted, *inter alia*, that she "described actually what would have been the reason for the whereabouts of the defendant[.]" Focusing on the word "actually," Appellant contends that the use of this term constituted an endorsement of the evidence as establishing his guilty conscience. Assuming that the term could have been understood as conveying the meaning that Appellant advances, given the trial court's stated purpose for reviewing the evidence and acknowledgment of the jury's role as fact-finder, we decline to conclude that this isolated reference was prejudicial.

Next, Appellant notes that, in discussing the testimony of a police officer who testified to Appellant's admissions, the recording of his statement, and the circumstances surrounding it, the court's summary suggested that the officer's testimony was "accurate and complete." Appellant fails to acknowledge, however, that the court cautioned the jury that they would have to weigh the officer's credibility in determining the circumstances surrounding Appellant's statements.

In referring to the testimony of M.O., the court mentioned a second rape, which Appellant argues indicated his guilt of the first rape—the one involving Ms. Graham. Furthermore, Appellant takes issue with the court's limiting instruction concerning the M.O. assault, arguing that the references in the instruction to a similarity between the offenses implied Appellant's guilt, and that the court indicated that he had been found guilty of other crimes. As noted, the reference to any similarity between the offenses was part of a lengthy limiting

instruction cautioning the jury to consider the other crimes evidence solely for the purpose of establishing the identity of the perpetrator. The court repeatedly advised the jurors that they were to determine the weight to afford such evidence, and that Appellant had not been tried or convicted of the M.O. assault.

Regarding the defense evidence, Appellant asserts that the court's discussion of the testimony of his uncle, Morris Hawthorne, in connection with Appellant's waiver of his constitutional rights and subsequent admission, directed the jury to find a valid waiver of such rights. In summarizing Mr. Hawthorne's testimony, the court indicated only that he had testified to Appellant's background, intelligence, and the circumstances of the two interrogations. In the same vein, the court also discussed the standards for evaluating whether a waiver of one's constitutional rights was knowing and voluntary by referencing certain decisions from this Court, in which statements by defendants with limited educational backgrounds and mentality were deemed admissible. In so doing, Appellant asserts that the court directed the jury to find that his confession was voluntary as a matter of law. The examples, however, were offered to highlight the fact that an assessment of voluntariness requires consideration of the totality of the circumstances, as opposed to solely deficiency in education or mentality.

Next, Appellant disputes the court's consciousness of guilt instruction, which focused upon evidence indicating that Appellant had stayed away from the scene of the crime, and had wrung his hands when in the presence of Ms. Moore. The conduct of an accused following a crime, including "manifestations of mental distress," is admissible as tending to show guilt. *Commonwealth v. Homeyer*, 373 Pa. 150, 159, 94 A.2d 743, 747 (1953). Here, the court merely advised the jury that, although they were not required to, they were permitted to consider Appellant's actions as manifestations of mental distress tending to show a consciousness of guilt.

■ Similarly, Appellant argues that the court's discussion of circumstantial proof improperly focused upon circumstances indicating his guilt, for example, the court referred to the letters that had been burned into the ceiling at the crime scene and those appearing on the ceiling of Appellant's bedroom. Notably, the court also employed generic examples of circumstantial evidence as part of the explanation. In any event, the instruction was aimed at contrasting the Commonwealth's indirect or circumstantial proof with direct evidence, and the fact that the court used as examples certain aspects of the circumstantial evidence in Appellant's case did not improperly suggest his guilt.

■ In defining the offense of arson endangering persons, the court stated that the persons who were recklessly placed in danger by the fire were the residents of the block where the offense occurred. According to Appellant, the court's identification of the alleged victims had the effect of directing a guilty verdict for that offense. In making his argument, Appellant fails to acknowledge that the court's effort was aimed at ensuring that the jury did not treat Ms. Graham as a victim of the arson, as the evidence indicated that she had died before the fire was started. Furthermore, the court explained that the jurors must find as an element of the offense that the fire endangered another person.

Despite Appellant's emphasis of particular words employed by the court during its commentary, at no point did the court express an opinion as to Appellant's guilt or innocence, or the credibility of any of the witnesses. *See Commonwealth v. Meadows*, 567 Pa. 344, 354–55, 787 A.2d 312, 318 (2001) (quoting *Commonwealth v. Leonhard*, 336 Pa.Super. 90, 95, 485 A.2d 444, 446 (1984)). Moreover, as noted, because the court's comments were issued in conjunction with frequent admonitions that the jurors were to rely upon their own recollection of the facts and form their own conclusions, there was no basis for prior counsel to object and raise this issue on appeal. *See Commonwealth v. Whitson*, 461 Pa. 101, 107, 334 A.2d 653, 655 (1975).

Appellant's final challenge to the guilt-phase instructions involves the court's use of a hypothetical to differentiate between first- and second-degree murder. In the hypothetical, the court explained that if, during the course of a robbery, two robbers shoot a bank teller multiple times with a machine gun, their actions would indicate a willful, deliberate, and premeditated murder, as opposed to a murder in the second degree. Appellant argues that the hypothetical indicated that a killing during the commission of a felony constitutes murder in the first degree even absent specific intent to kill. Although the hypothetical was inapt, the trial court's use of it occurred during a lengthy discussion of the various degrees of murder, and it was directed at explaining that circumstantial evidence of a specific intent to kill may be drawn from the manner in which the homicide was committed, such as, multiple gunshot wounds. Therefore, counsel cannot be faulted for failing to object and raise a challenge to this instruction on appeal.

### Penalty Phase

Appellant contends that, as a result of prosecutorial misconduct and ineffective assistance of counsel, he was prevented from offering as a mitigating circumstance his lack of a significant history of prior criminal convictions. *See* 42 Pa. C.S. § 9711(e)(1). By way of background, prior to the commencement of the penalty phase, trial counsel sought rulings respecting the presentation of evidence bearing upon certain mitigating circumstances, including whether the assertion that Appellant did not have a significant history of prior criminal convictions, would allow the Commonwealth to rebut such claim with evidence that, as a 13–year–old juvenile in 1976, Appellant had sexually assaulted a minor female in a vacant house at knifepoint.[34] In this regard, the Commonwealth intended to call the detective who investigated that incident to

---

**34.** The Commonwealth refers to the offense as a rape, and Appellant characterizes it as an attempted rape. The notes of testimony from the decertification hearing indicate that the 1976 charges were for statutory rape, indecent exposure, indecent assault, simple assault, and involuntary deviate sexual intercourse.

testify to statements he elicited from witnesses and Appellant. Notably, Appellant received a consent decree disposition for the 1976 offenses. *See generally* Act of July 9, 1976, P.L. 586, No. 142, § 2, ch. 63 (Subchapter C, Section 6340). The trial court ruled that, if Appellant offered the no significant history mitigating circumstance, the Commonwealth would be permitted to present testimony from the detective, but not the juvenile record.[35] As a result, counsel declined to invoke the mitigator and did not challenge the ruling on appeal.

Appellant maintains that, although the prosecutor knew that Appellant had been placed on consent decree, he did not advise the court or trial counsel, allowing them to proceed under the assumption that a conviction or adjudication occurred. In this same vein, Appellant asserts that prior counsel was ineffective for failing to both ascertain the disposition of the 1976 offense and raise this issue on appeal. Because he received a consent decree disposition, Appellant argues that the Commonwealth could not have introduced the offense to rebut the no significant history mitigator.

The Commonwealth responds that Appellant "pleaded guilty to the rape via consent decree," and that this disposition was the equivalent of a criminal conviction. In the alternative, the Commonwealth argues that Appellant's claim concerning the admissibility of the consent decree is moot, as the trial court's ruling limited the Commonwealth to presenting evidence of

---

**35.** The trial court also ruled that if Appellant presented evidence touching upon his character in connection with the catch-all mitigator, 42 Pa.C.S. § 9711(e)(8), the Commonwealth would be permitted to rebut the proof with testimony concerning the prior sexual assault. The trial court reasoned that discretion to admit evidence of the prior sexual assault was afforded under Section 9711(a)(2) of the Sentencing Code, 42 Pa.C.S. § 9711(a)(2), which at the time of Appellant's trial provided:

> In the sentencing hearing, evidence may be presented as to any matter that the court deems relevant and admissible on the question of the sentence to be imposed and shall include matters relating to any of the aggravating or mitigating circumstances specified in subsections (d) and (e). Evidence of aggravating circumstances shall be limited to those circumstances specified in subsection (d).

Act of Sept. 13, 1978, P.L. 756, No. 141, § 1. This provision has been amended to permit the introduction of victim impact evidence. *See* Act of Oct. 11, 1995, P.L. 1064, No. 22, (Spec.Sess. No. 1), § 1.

Appellant's prior criminal conduct, as opposed to the record of the juvenile disposition. Characterizing the assertion that Appellant lacked a significant history of prior criminal convictions as a fraud, the Commonwealth maintains that evidence of the prior rape would have been admissible to rebut this false mitigation claim.

Addressing these arguments, the PCRA court concluded that the fact that the juvenile case resulted in a consent decree was of no significance, as the disposition would have bound the parties in the same manner as a final decree issued following a hearing on the merits. *See* PCRA Ct. Op. at 21 (citing *In re John W.*, 300 Pa.Super. 293, 296, 446 A.2d 621, 623 (1982)). Moreover, the PCRA court viewed the reasoning supporting the admission of a juvenile adjudication to rebut the no significant history mitigator, *see Stokes*, 532 Pa. at 261–62, 615 A.2d at 714, as equally compelling in the present circumstance.

■ Generally, a conviction is defined as "the ascertainment of the guilt of the accused and judgment thereon by the court." *Commonwealth v. Kimmel*, 523 Pa. 107, 111, 565 A.2d 426, 428 (1989) (citation omitted); *see also Commonwealth v. Caine*, 453 Pa.Super. 235, 241, 683 A.2d 890, 893 (1996). In the context of the Death Penalty Statute, this Court has accorded the term a broader reach, encompassing instances in which there has been a finding of guilt, even though a judgment of sentence has not yet been imposed. *See Commonwealth v. Beasley*, 505 Pa. 279, 287–88, 479 A.2d 460, 464 (1984) (citing *Commonwealth v. Travaglia*, 502 Pa. 474, 497–98, 467 A.2d 288, 300 (1983)). A juvenile delinquency adjudication, which involves a finding that a juvenile committed a criminal act, *see* 42 Pa.C.S. § 6341(a), (b), has therefore been treated as a conviction for purposes of establishing the aggravating circumstance that a defendant has a significant history of felony convictions involving the use or threat of violence to the person. *See Commonwealth v. Baker*, 531 Pa. 541, 565, 614 A.2d 663, 675 (1992). For similar reasons, juvenile delinquency adjudications have been deemed admissible to rebut

the mitigating circumstance at issue here. *See Stokes,* 532 Pa. at 261–62, 615 A.2d at 714.

Appellant, however, was not adjudicated delinquent for the 1976 offenses; rather, he received a consent decree, which is analogous to the accelerated rehabilitative disposition program available to adults. *See Commonwealth v. Wexler,* 494 Pa. 325, 333, 431 A.2d 877, 881 (1981). A consent decree does not involve a finding of guilt; instead, the delinquency proceedings are suspended while the juvenile undergoes a period of probation supervision and, assuming successful completion, the petition is dismissed. *See* 42 Pa. C.S. § 6340(a), (e); *Commonwealth v. J.H.B.,* 760 A.2d 27, 32 (Pa.Super.2000). This particular disposition would not have met the criteria for a criminal conviction and, consequently, would not have been admissible to rebut the no significant history mitigator. *Accord* Act of July 9, 1976, P.L. 586, No. 142, § 2, ch. 63 (Subchapter D, Section 6354(a), providing that, *inter alia,* "[a]n order of disposition ... under this chapter is not a conviction of crime").[36]

---

**36.** In his concurring and dissenting opinion, Mr. Justice Castille would apparently interpose a requirement of "controlling interpretive decisional law" as threshold to every ineffectiveness challenge, even where the challenge rests upon statutory provisions that are facially controlling and evidently favorable to the defense position. *See* Concurring and Dissenting Opinion, *slip op.* at 8. We decline, however, to adopt such a requirement. While this Court has held that counsel cannot be ineffective for failing to anticipate *changes* in the law, *accord United States v. Ardley,* 273 F.3d 991, 993 (11th Cir.2001) (describing a "wall of binding precedent" to this effect), it has never relieved counsel of the obligation to vindicate his client's interests under existing statutory provisions. Indeed, such a practice would erode the constitutional entitlement to effective counsel, as it would render enforcement of this right available only after a process of specific resolution by this Court of each and every potential alternative construction of relevant statutory law (apparently no matter how creative or remote). Moreover, under the then applicable ethical code, trial counsel had an obligation to "resolve in favor of his client doubts as to the bounds of the law." Code of Prof'l Responsibility EC 7–3 (1974) (superseded). Other courts also distinguish scenarios involving failure to anticipate a change in the law from the failure to pursue readily available arguments relative to unsettled law. *See, e.g., Pelmer v. White,* 877 F.2d 1518, 1523 (11th Cir.1989) ("That the law is unsettled on a point does not mean the legal basis for arguing the point is unavailable."); *Fisher v. State,* 810 N.E.2d 674, 679 (Ind.2004); *Ex parte Welch,* 981 S.W.2d 183, 185 (Tex.Ct.

The trial court's ruling, however, was limited to allowing the Commonwealth to introduce evidence of the prior offenses, not the juvenile court record.[37] Ordinarily, specific instances of conduct involving other crimes are not admissible to prove character. *See Commonwealth v. Morris*, 493 Pa. 164, 175, 425 A.2d 715, 720 (1981); *accord* Pa.R.E. 404(b), 405(b). Exceptions to this prohibition exist where the prior bad act is offered to prove, *inter alia*, motive, intent, plan, or absence of mistake. *See Morris*, 493 Pa. at 175, 425 A.2d at 720; Pa.R.E. 404(b)(2). These circumstances are most pertinent in the context of establishing guilt. The present claim, by contrast, concerns a sentencing proceeding, in which the prior bad act evidence was deemed admissible as tending to rebut both the assertion that Appellant had no significant history of prior criminal convictions and evidence of his good character under the catch-all mitigator. With respect to the former, while a certain degree of latitude has been extended to the Commonwealth in responding to this mitigator, *see, e.g., Commonwealth v. Basemore*, 525 Pa. 512, 531, 582 A.2d 861, 870 (1990) (concluding that evidence of a single prior conviction is admissible to rebut the no significant history mitigator), where, as here, there has not been a conviction or a finding of

Crim.App.1998) (explaining that, "to be reasonably likely to render effective assistance to his client, a lawyer must be sufficiently abreast of developments in criminal law aspects implicated in the case at hand" and holding that the underlying claim "should have been evident from a plain reading of the [relevant] statute itself"); *cf. Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir.1994) ("[A] petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker").

37. Although the court and counsel incorrectly referred to the juvenile disposition as a conviction, in light of the ruling, Appellant's claims of prosecutorial misconduct and ineffectiveness respecting the nature of the juvenile record are not directly implicated. While it is possible that the trial court's decision may have been affected by the belief that there had been a finding of guilt on the prior offenses, the notes of testimony do not indicate that the judge relied upon this fact and, as the judge has since passed away, Appellant would not be able to establish such reliance. Furthermore, the prosecutor never sought to introduce the juvenile record, indicating only that he wished to present testimony from the detective who investigated the prior assault if Appellant intended to introduce character evidence.

guilt, we decline to view the evidence as constituting proper rebuttal. Similarly, as Appellant did not present any character evidence, proof of the prior assault would not have been admissible as rebuttal on this basis.

What remains is whether the evidence would have been otherwise admissible. As noted, in addressing Appellant's mitigation proffer, the trial court observed that Section 9711(a)(2) of the death penalty statute, 42 Pa.C.S. § 9711(a)(2), provided authority for the admission of "evidence ... that the court deems relevant and admissible on the question of the sentence to be imposed." *Id.*[38] Significantly, the court's reliance upon Section 9711(a)(2) was in relation to the rebuttal of any potential character evidence adduced by Appellant pursuant to the catch-all mitigator. The trial court did not specifically invoke this provision as a basis for allowing the admission of the prior bad act evidence as rebuttal to the assertion of the no significant history mitigator. With respect to the rebuttal of character evidence, the trial court's ruling aligns with the view that Section 9711(a)(2) establishes a mechanism for the Commonwealth to respond to the broad range of mitigation that may be presented under the catch-all circumstance. *See Commonwealth v. Fisher,* 545 Pa. 233, 268, 681 A.2d 130, 147 (1996). In *Fisher,* the Court explained that when the death penalty statute was amended to afford greater latitude in the introduction of mitigation evidence, Section 9711(a)(2) was amended, adding language to allow the admission of evidence relevant to the sentence to be imposed. *See id.* The Court in *Fisher* thus reasoned:

> When the historical context of the amendments to the death penalty statute is examined, it becomes obvious that § 9711(a)(2) was rewritten in response to the expansion of mitigating circumstances that could be introduced at trial. The amendment gave latitude to the Commonwealth to introduce evidence to counter and respond to whatever mitigating evidence was introduced that fell within the "catch-all" provision for mitigating circumstances. It was

---

**38.** While this provision has been amended since Appellant's trial, the language at issue has not been altered. *See supra* note 35.

not intended to supply the Commonwealth with its own "catch-all" provision for "any other" evidence, such as victim impact evidence, in its penalty phase case.

*Id.*[39] As the evidence introduced by Appellant under the catch-all circumstance related to his intellectual functioning and the fact that his mother had abandoned him, the prior assault would not have been admissible as tending to rebut this presentation.[40]

**39.** This rationale was consistent with earlier decisions involving the scope of Section 9711(a)(2). For example, in *Commonwealth v. Abu-Jamal*, 521 Pa. 188, 555 A.2d 846 (1989), while the Court stated that the language in Section 9711(a)(2) permitted the exploration of matters other than aggravating and mitigating circumstances, this pronouncement was framed in terms of allowing the prosecutor to contradict defense assertions, with the holding similarly grounded. *See id.* at 214, 216, 555 A.2d at 858, 859; *accord Commonwealth v. Ford*, 539 Pa. 85, 105, 650 A.2d 433, 442 (1994) (citing Section 9711(a)(2) and concluding that evidence of prior conviction was relevant as rebutting an "implication that appellant would be amenable to rehabilitation").

**40.** Mr. Justice Castille contends that our approach to rebuttal is an "innovative one which ignores the requirement of contemporary assessment." *See* Concurring and Dissenting Opinion, *op.* at 819. We respectfully disagree. The appropriate scope of rebuttal has always been defined according to the evidence that it is offered to rebut. *See generally Commonwealth v. Hickman*, 453 Pa. 427, 432, 309 A.2d 564, 567 (1973) ("It is not proper to submit on rebuttal, evidence which does not in fact rebut the opponent's evidence."). Indeed, in the character evidence setting, this precept has been particularly enforced. *See, e.g., Commonwealth v. Vander Weele*, 356 Pa.Super. 152, 158, 514 A.2d 189, 193 (1986) (explaining, "[f]or instance, when a character witness testifies to being familiar with a defendant's reputation for truthfulness, cross-examination pertaining to a crime of assault is improper"); *accord United States v. Curtis*, 644 F.2d 263, 268 (3d Cir.1981) ("Obviously cross[-]examination must be confined to matters bearing on the particular character trait to which the witness testified."). The reasoning by the lead opinion in *Commonwealth v. Rice*, 568 Pa. 182, 795 A.2d 340 (2002) (Opinion Announcing the Judgment of the Court), is not to the contrary as suggested by Mr. Justice Castille, as the defendant in that case sought to introduce evidence of his character for kindness under the catch-all mitigating circumstance, which the Commonwealth proposed to rebut with evidence indicating the opposite character trait, specifically, that he had stabbed people while in prison. *See id.* at 208, 795 A.2d at 355; *accord Basemore*, 525 Pa. at 537, 582 A.2d at 873 (Cappy, J., concurring) (explaining that the presentation of evidence under the (e)(8) catch-all circumstance does not automatically place a defendant's character in issue, "thereby opening the door for the Commonwealth to rebut on the issue of character"). In fact, the innovative argument is that which is offered by the Concurring and

The more difficult determination is whether Section 9711(a)(2) permits the admission of evidence beyond the statutory "eligibility" and "selection" criteria, outside the purview of rebuttal.[41] In the context of a mitigation presentation, admissibility has been premised upon relevance in connection with the statutory circumstances. *See, e.g., Commonwealth v. Harris*, 572 Pa. 489, 524, 817 A.2d 1033, 1054 (2002).[42] Although in *Commonwealth v. Means*, 565 Pa. 309, 773 A.2d 143 (2001) (Opinion Announcing the Judgment of the Court), a plurality of the Court stated that relevant evidence under Section 9711(a)(2) was not limited to aggravating and mitigating circumstances; this pronouncement was in relation to the ability of the Commonwealth to introduce victim impact testimony pursuant to a specific statutory authorization within the same provision. *See id.* at 324–25, 773 A.2d at 152–53. The precedent in this area has, therefore, circumscribed admissibility to evidence that tends to establish or rebut statutory eligibility or selection criteria, namely, aggravating or mitigat-

Dissenting Opinion, namely, that the Commonwealth's rebuttal of defense evidence in the penalty phase of a capital case should be treated differently from every other context. *See* Concurring and Dissenting Opinion, *op.* at 820. We decline to accept this position, or the proposition that an ineffectiveness challenge based on counsel's failure to pursue vindication of generally prevailing precepts in the capital sentencing context is necessarily foreclosed solely because the Court had not at the time announced that those salient prevailing and generally applicable principles should apply in capital sentencing determinations.

41. The capital sentencing process implicates two discrete determinations; the first is eligibility, in which the statutory scheme narrows the class of persons who may be subject to the death penalty; the second is selection, at which point the sentencer decides whether a person who is eligible for the death penalty should receive such punishment. *See Tuilaepa v. California*, 512 U.S. 967, 971, 114 S.Ct. 2630, 2634, 129 L.Ed.2d 750 (1994). Aggravating circumstances provide the means of narrowing the class for purposes of eligibility and, under the Pennsylvania statute, along with mitigating circumstances and victim impact evidence, serve as the bases for the selection decision. *See* 42 Pa.C.S. § 9711(c)(1), (2).

42. Similarly, the Court has cautioned against arguments that interject external considerations into the penalty phase out of concern that these factors may improperly "influence[] the jury's balancing of mitigating and aggravating circumstances." *See Commonwealth v. DeJesus*, 580 Pa. 303 325–27, 860 A.2d 102, 116 (2004) (citing *Commonwealth v. LaCava*, 542 Pa. 160, 192, 666 A.2d 221, 237 (1995)).

ing circumstances and victim impact evidence. *See supra* note 35.[43] This limitation is consistent with the instructions provided to the jurors. *See* 42 Pa.C.S. § 9711(c)(1), (2). Indeed, there is no provision explaining how a jury should consider a factor extraneous to the statutory criteria. *Cf. Means*, 565 Pa. at 334, 773 A.2d at 158 (addressing the need for an appropriate jury instruction to explain the limited role of victim impact evidence). More important, under the Pennsylvania scheme, the introduction of non-statutory facts and circumstances may affect a jury's eligibility determination, thereby implicating constitutional concerns. *See generally Lowenfield v. Phelps*, 484 U.S. 231, 244, 108 S.Ct. 546, 554, 98 L.Ed.2d 568 (1988) (explaining that the constitutionality of a capital sentencing procedure hinges, in part, upon whether the eligibility criteria/aggravating circumstances genuinely limit the class of persons who may be subject to the death penalty).[44] Here, while the prior bad act evidence may be viewed as having relevance respecting Appellant's dangerousness and thus might alter the jury's sentencing determination,[45] this consideration is not provided for within the statutory scheme. Consequently, Section 9711(a)(2) would not have furnished an independent basis for the admission of such proof.

Thus, Appellant's underlying claim is of merit. While there does not appear to be a reason for counsel's failure to pursue

**43.** The plurality decision in *Commonwealth v. Trivigno*, 561 Pa. 232, 254, 750 A.2d 243, 254 (2000) (Opinion Announcing the Judgment of the Court), is not necessarily to the contrary, as the external fact at issue there was a future dangerousness argument by the prosecutor, which, although not a statutory eligibility or selection consideration, was not evidence admitted pursuant to Section 9711(a)(2). We acknowledge, nevertheless, that similar interests are involved in this circumstance. *See supra* note 39.

**44.** By contrast, assuming statutory authorization, there is no constitutional prohibition to the expansion of a jury's focus in connection with the selection process. *See Tuilaepa*, 512 U.S. at 979–80, 114 S.Ct. at 2639. The Pennsylvania Death Penalty Statute, however, does not provide for consideration of factors outside those denominated as aggravating or mitigating circumstances or victim impact evidence.

**45.** No issue is presented in terms of whether the evidence may have been excludable because its probative value was outweighed by the danger of unfair prejudice. *See* Pa.R.E. 403.

this issue on direct appeal,[46] as the PCRA court did not hold a hearing, we cannot discern whether a reasonable basis existed for counsel's omission. In such circumstance, this Court has declined to divine, in the first instance on appellate review, whether counsel's actions were reasonably based. *See Commonwealth v. Duffey*, 579 Pa. 186, 203–05, 855 A.2d 764, 775 (2004) (citing *McGill*, 574 Pa. at 588, 832 A.2d at 1022). For similar reasons, the absence of a hearing and fact finding affects our ability to assess prejudice. Here, there appears to be a basis for a finding of prejudice, since the trial court's ruling prevented Appellant from presenting a substantial mitigating factor and no other mitigating circumstances were found and, as a result, the jury never engaged in the balancing or weighing process with the lone aggravator that was found. Nevertheless, as the matter must be remanded for a hearing concerning the existence of a reasonable basis for counsel's actions, it is preferable that any assessment of prejudice be made, in the first instance, by a fact finder.

 Next, Appellant contends that prior counsel rendered ineffective assistance in failing to object and argue on appeal that the jury unconstitutionally failed to consider and was impeded from considering his age of 16 years, 11 months and 24 days as constituting a mitigating circumstance. In framing this argument, Appellant asserts that his chronological age was a mitigating factor of great weight that must be considered by the sentencer, and that the failure of the jury to accord such factor any weight violated his rights under the Eighth and Fourteenth Amendments of the United States Constitution.[47] Appellant also argues that the court improper-

---

46. This is not an instance where counsel would have had to "puzzle out the theory" for raising the issue on appeal, as suggested in the Concurring and Dissenting Opinion authored by Mr. Justice Castille. As noted, trial counsel (who was the same attorney who litigated the direct appeal) specifically objected at trial to the relevance of the proposed rebuttal.

47. We note, parenthetically, that the United States Supreme Court recently agreed to re-consider whether it is constitutionally permissible to execute persons who were juveniles at the time of their capital offenses in *State ex rel. Simmons v. Roper*, 112 S.W.3d 397 (Mo.2003),

ly instructed the jury by: advising them to consider their own subjective experience; linking the age mitigator with the point at which an individual is capable of effectively and rationally making a decision in matters of importance; and cautioning the jurors not to be persuaded by empathy or sympathy. Finally, Appellant maintains that the prosecutor improperly argued that the jury should ignore the mitigating circumstance of age.

■■■ Age is statutorily recognized as a mitigating circumstance, *see* 42 Pa.C.S. § 9711(e)(4), and may be entitled to significance in the weighing process. *See Eddings v. Oklahoma*, 455 U.S. 104, 116, 102 S.Ct. 869, 877, 71 L.Ed.2d 1 (1982). At the same time, this Court has declined to treat age as a *per se* mitigator, viewing it as a factor wholly within the province of the sentencing authority. *See Commonwealth v. Williams*, 524 Pa. 218, 231–32, 570 A.2d 75, 82 (1990). Such treatment is consistent with the premise that an individual's chronological age may be entitled to different consideration depending upon a number of factors, including, maturity, sophistication, criminal history, and the circumstances of the offense. *See generally State v. Bey*, 129 N.J. 557, 610 A.2d 814, 842–43 (1992) (collecting cases and noting that "[a] defendant's young age does not divest a jury of its discretion to determine whether or not the age mitigating factor applies").[48]

■■ While the prosecutor argued that Appellant's age should not be a determinative factor given the circumstances of the offense and his courtroom demeanor, this argument was in response to defense evidence and argument and, therefore, permissible. *See Basemore*, 525 Pa. at 529, 582 A.2d at 869. Moreover, the court instructed the jurors that they were to consider Appellant's youth at the time of the crime as a mitigating circumstance and explained:

cert. *granted,* 540 U.S. 1160, 124 S.Ct. 1171, 157 L.Ed.2d 1204 (Jan. 26, 2004) (No. 03–633).

**48.** Nevertheless, a jury is required to find a mitigating factor where it has been presented by stipulation. *See Commonwealth v. Rizzuto,* 566 Pa. 40, 74, 777 A.2d 1069, 1089 (2001).

There is no case law defining the mitigating circumstance of youth. A pertinent provision states, "The youth of the defendant at the time of the crime." No age is explicitly set forth.

When you think of youth, absent a depiction of what they mean by "youth" in the Act, in terms of the common, ordinary understanding of that word to yourselves, it could mean chronological or specific age. It could mean mental maturity, the ability to take care of one's self, a mental state sufficient to make a decision in a matter of consequence to one's self. Various legislation throughout the States indicates that you can vote now at the age of 18. Some say that kids under 21 can drink alcoholic beverages.

You might ask yourselves, in the sense of the meaning of youth, [w]hen did I, looking back in terms of my day-to-day living, looking back in terms of my experience of seeing people raised in my family and my friends, when did I arrive at such an age that I was fully capable to effectively and rationally make a decision in matters of importance to myself?

And I say this, you are all intelligent human beings. There is no definition of the term youth. The provisions of the Statutory Construction Act in force presently in the Commonwealth of Pennsylvania say this: "In the absence of a definition, words in a statute are to take their common, ordinary, everyday meaning."

So the question that you must answer in your minds is, [w]hat in your minds individually and collectively constitutes the meaning in ordinary terms, everyday language, everyday meaning of the word "youth"? It means many things to many people.

█ In general, it is proper for a jury to draw upon knowledge and common experience to reach a conclusion, provided that the evidence produced at trial is not influenced by facts outside the record known to the jurors personally. Here, the judge's instruction allowing them to reference youth in terms of common experience did not preclude the consideration of Appellant's age as a mitigating circumstance. Accord-

ingly, prior counsel cannot be deemed ineffective for failing to object and raise as issues the prosecutor's closing argument concerning the age mitigator, the trial court's instructions on such circumstance, and the jury's failure to find it.

▮ Citing the fact that certain of the jurors wore green ribbons at the beginning of the trial, symbolizing their sympathy for families of African–American children murdered in Atlanta, Appellant argues that prior counsel rendered ineffective assistance for failing to seek a full and appropriate *voir dire* of those jurors as to whether their sentencing decision would be compromised by such a show of support. In making this claim, Appellant acknowledges that: prior counsel objected to the fact that the jurors were wearing green ribbons; the court questioned those jurors; and in connection with a challenge to the fairness of the trial, prior counsel asserted on direct appeal that the jurors' wearing of the ribbons in conjunction with the pre-trial publicity denied him a fair trial. *See Hughes,* 521 Pa. at 454, 555 A.2d at 1280. Despite the similarity of the issue on direct appeal and the current claim, Appellant maintains that the issue has not been previously litigated, as the focus of the colloquy was the guilt phase, and the current argument is based upon fairness in the penalty phase. In this respect, Appellant emphasizes the uniqueness of the jury's sentencing decision apart from its determination of guilt.

The trial court's colloquy of the individual jurors, however, centered upon their ability to be fair and impartial generally. Moreover, the trial court ultimately sequestered the jurors to ensure that they would not be exposed to any outside influence. Appellant's underlying claim is based upon the same circumstance, namely, the wearing of the green ribbons and, similarly, focuses upon the fairness of the jurors to render a decision. While a jury's capital sentencing function is distinct from its guilt-phase role, we do not perceive any reason why the trial court's general inquiry into the fairness and impartiality of the jurors in response to the concern with the green ribbons was inadequate, in this circumstance, to protect Appellant's rights in connection with the penalty phase, and

Appellant does not provide one. As Appellant's underlying claim was addressed on direct appeal, and as he has not proffered a sufficient reason to distinguish his present allegation, he cannot establish ineffective assistance.

▮▮▮▮▮▮▮ Appellant raises numerous claims concerning the prosecutor's penalty-phase argument, which he characterizes as unconstitutional. In general, "comments by a prosecutor do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and render a true penalty determination." *Commonwealth v. Johnson*, 542 Pa. 384, 404, 668 A.2d 97, 107 (1995). Such assessment requires that the remarks be considered contextually, including whether the argument was responsive to the defense closing. *See Commonwealth v. Freeman*, 573 Pa. 532, 578, 827 A.2d 385, 413 (2003). As noted, Appellant casts his claim as one of constitutional dimension. An improper closing argument may constitute constitutional error where the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974). As with the corresponding state standard, federal constitutional law requires that the statements be viewed in the context of the entire proceeding, *see id.* at 639, 94 S.Ct. at 1869, including reference to the argument of defense counsel. *See United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985). Both standards concentrate on the effect of the improper remarks upon the fairness of the verdict and are thus consistent. *See generally Henry v. Horn*, 218 F.Supp.2d 671, 705 (E.D.Pa. 2002).

Initially, Appellant asserts that the prosecutor "deliberately deceived the jury" by emphasizing Appellant's courtroom demeanor and the fact that he had taken notes throughout the trial as bases for rejecting the finding of mitigating circumstances associated with Appellant's age and low intelligence. In support, Appellant maintains that the prosecutor knew that

Appellant's calm demeanor was not his natural state, but rather, was the product of the administration of antipsychotic medication administered at the prosecutor's request. Furthermore, Appellant argues that the prosecutor knew, based upon the results of numerous psychological evaluations, that Appellant was incapable of taking meaningful notes, and that such notes actually consisted of "crudely drawn cartoons and childish scribblings."

The summation of defense counsel emphasized Appellant's demeanor and age as follows:

I wonder whether he really has a true understanding of the nature and consequences of this particular proceeding.

It's easy to elevate an individual by saying he's functioning at some sort of intellectual level that appears to be normal. Forgetting about the psychologist, forgetting about all the reports, you have been in his presence for so many days, you have had the opportunity to see whether or not he functions normally, whether or not he has the kind of mentality that creates in a person a kind of understanding of hatred, of malice, of wickedness.

What is telling about the psychologist and what really affirms and confirms what I am saying to you is that this individual may be suffering some from a mild brain damage. Whatever that may be, I have no idea. But it doesn't take an expert in the area to come to that conclusion. He is an exhibit. You have had an opportunity to watch him.

He may be 19 years of age at the present time chronologically, but he really and truly is functioning no more than at the age of 3 or 4....

Immediately following defense counsel's remarks, the trial court excused the jury, observing:

[The Court]: Mr. Tinari, in the interests of the integrity of the trial, something either cooked up or prefabricated is taking place at the table. All of a sudden, at the last stage of trial, he has a ruler out, is making up some pictures and so forth and so on.

Clear the table, Mr. Tinari.

All of a sudden, at the end of trial, at this juncture, at the District Attorney's speech, he has pictures pinned up and everything else—very quiet—and writing on his pad all during the trial.

* * *

He is making a project there. Clear the desk of everything but the pad and the pencil. Take the ruler.

I don't know what is happening. Take his toys.

* * *

All right. Make sure he has just the pad real nice, like, the conditions that existed all during the trial.

This is not kindergarten with blocks and play things, you know. He was writing like a mature adult all during the trial.

[Mr. Tinari]: I will read it to you, what he wrote—

[The Court]: I don't want to know. All I am—[Mr. Tinari]: It says, "Mary had a little lamb."

[The Court]: Good. He wrote better than that during the trial. Now you get an idea like it simulates a child's nursery.

[Mr. Tinari]: Judge, you are cynical.

[The Court]: No, I am alive.

[Mr. Tinari]: Mr. King didn't object.

[The Court]: Let them do the job by thinking not on the basis of any theatrics but on the basis of the evidence.

* * *

All of a sudden, before the death penalty stage, it becomes a kindergarten. Very odd. Very brilliant.

In response to defense counsel's remarks, the prosecutor stated in his closing argument:

Now, it's a strange irony that Mr. Tinari can stand up and talk to you about childlike. Childlike? And I bring to your mind at this point, Ladies and Gentlemen, what is written:

When I was a child, when I was playing as a child, I acted as a child; but when I became a man, I gave up childish pursuits.

Now, if you can look at this defendant and what he did, what you found he did, and say, but that's the action of a child?

Age alone is no determiner. Use your common sense.

Isn't it strange, Ladies and Gentleman, if you are watching at all in this particular case, from the calm person who took notes after notes after notes to the person who spent three days on the witness stand—where is the child then? Where was he then?

\* \* \*

Age in and of itself is no excuse. He was 16–16 years, 11 months, and 24 days. What does that matter? Did age stop him from getting the idea that it's better to take than to be given? That it is better to pick a nine-year-old victim for less resistance?

\* \* \*

I'm asking you, Ladies and Gentleman, to find aggravation and I'm asking you to find aggravation outnumbering mitigation. For, all the defense has said to you is that this is a boy, he has trouble reading.

 Contrary to Appellant's suggestion, it was defense counsel who interjected Appellant's courtroom demeanor as a factor for the jury to consider. The prosecutor's responsive commentary was therefore allowable. *See Commonwealth v. Abu-Jamal,* 553 Pa. 485, 561–62, 720 A.2d 79, 117 (1998). Concerning the prosecutor's reference to Appellant's calm demeanor and note-taking, as indicated by the trial court's comments, the focus was on comparing Appellant's prior behavior at trial with his behavior during the defense penalty-phase closing. Consequently, the prosecutor's statements did not unfairly undermine the presentation of any mitigating

circumstance and were permissible responses to defense counsel's remarks.[49]

■ Next, Appellant argues that the prosecutor improperly urged the jurors to disregard the law by arguing that they should not let "what [Appellant] is and his environment" affect the sentencing decision, as such considerations are a discredited relic of the "great society that failed." Appellant maintains that, pursuant to the catch-all circumstance in Section 9711(e)(8) of the Sentencing Code, "what Appellant is and his environment" should have been at the center of the jury's decision, and that it was improper for the prosecutor to urge the jurors to disregard such consideration. The context of the prosecutor's closing remarks was as follows:

> In an ordered society, ladies and gentleman, you can do anything that you desire so long as it doesn't endanger or infringe on the rights of others.

> With that in mind and after sitting here listening to Mr. Tinari's argument, it brings visions of the great society that failed. It brings to mind, Help me rather than help myself. He brings to mind excuses, and he wants to make an excuse out of, "It's because of what he is and his environment."

> We are not prosecuting this defendant because he is black. We are not prosecuting him because he grew up at some point in his life in North Philadelphia and attended the Philadelphia school system.

> No one here is indicting the Philadelphia school system for the thousands upon thousands of people who find themselves in the same position as the defendant. Are they out raping? Are they out strangling? Are they out setting ablaze—

49. Appellant's mitigation theory was not premised upon his mental state at the time of the crimes; indeed, he did not invoke the mental status-related circumstances under Section 9711(e)(2), (3) of the Sentencing Code, 42 Pa.C.S. § 9711(e)(2), (3). Rather, Appellant was relying upon the catch-all circumstance of "any other mitigation concerning the character of the defendant" in Section 9711(e)(8) of the Sentencing Code, 42 Pa.C.S. § 9711(e)(8), as a basis for evidence respecting his level of intellectual functioning.

* * *

a nine-year-old child—children?

While the reference to the Great Society implicated a consideration outside the statutorily defined death-penalty eligibility and selection criteria, the prosecutor's argument was aimed at challenging the weight and credibility associated with Appellant's background-based mitigation. As such, under this Court's precedent, the commentary was not unduly prejudicial, and counsel cannot be found ineffective for failing to object and raise such challenge on appeal. *See Commonwealth v. Stokes,* 576 Pa. 299, 311, 839 A.2d 226, 233 (2003) (plurality opinion) (concluding that the prosecutor's comments concerning, *inter alia,* the Great Society, constituted permissible oratorical flair urging the jury to disfavor defense mitigation).[50]

█ Appellant also contends that the prosecutor improperly advised the jury that mercy should not enter into their sentencing decision which, according to Appellant, constituted a misrepresentation of the law and negated a central sentencing consideration. Here, the prosecutor stated:

> You have already found that [Appellant] didn't consider the welfare of Rochelle Graham. You have already found that he willfully, deliberately, and premeditatedly choked every breath of life out of her, than placed on her body debris and ignited it. You have found that he intended to kill.

> * * *

> If you can look at what happened to Rochelle Graham and say that at this stage you are asked to go beyond being human, you are asked to go beyond being rational, you are asked to come and pray, you are asked to show him mercy: I submit to you, Ladies and Gentleman, that mercy begets mercy.

**50.** Notably, the prosecutor in *Stokes* also handled the case against Appellant.

If you can look at the facts of this case and decide that the perpetrator you found guilty of first-degree murder deserves mercy, it is not for me to say that he doesn't.

The prosecutor's argument against mitigation did not prevent the jury from considering it, and significantly, the prosecutor's focus was on his request that the jury balance any consideration of mercy against the circumstances of the offense, one of which was an aggravator, namely, a murder committed during the perpetration of a felony.

 Similarly, Appellant asserts that the prosecutor prevented the jury from considering mitigation evidence by arguing for a death sentence based upon the nature of the offense. In particular, Appellant highlights the portion of the prosecutor's argument in which he stated: "when someone or any member of this community strikes in the fashion that you did, Mr. Hughes, we will not stand for it. We will not issue another chance." Here, again, the prosecutor's argument did not preclude the jury from considering mitigation evidence, although it was directed to advocating against it. In the same vein, Appellant argues that the prosecutor improperly circumvented the individualized sentencing requirement of the Eighth and Fourteenth Amendments of the United States Constitution by asking the jury to focus upon the existence of malice, which is present in any murder. The references on which Appellant bases his claim were as follows:

Can you think of a more gruesome case? Can you think of a situation where there was a reckless disregard, a hardness of heart, a mind fully conscious of its purpose?

While the prosecutor's argument referred to elements present in any murder, he did not ask the jury to find aggravation without reference to the statutory aggravating circumstances. Indeed, to the contrary, the prosecutor stated:

I am asking you to look at the evidence and, if you find that Rochelle Graham was raped, sodomized, and strangled, then ask yourself the question, were these acts done in the perpetration of a felony?

You have two felonies: rape, involuntary deviate sexual intercourse.

If you say yes to that, you have one aggravating circumstance.

Again, evaluating the argument in context, prior counsel will not be deemed ineffective for failing to object to the prosecutor's remarks and raise such issue on appeal.[51]

Next, Appellant contends that the prosecutor engaged in misconduct by arguing, *inter alia,* that: death was required to preserve an "ordered society" in which the "weak" are protected from the "strong"; a verdict of life would be to "back out" and "cop out"; and, the jury should "stand up loud and clear," and send a message to the defendant, defense counsel and society, and return a death sentence. Relying upon *Commonwealth v. LaCava,* 542 Pa. 160, 666 A.2d 221 (1995), Appellant maintains that the prosecutor's remarks were improper attempts to expand the jury's focus from the punishment of Appellant on the basis of the aggravating circumstances, to punishment premised upon society's victimization. Here, the prosecutor stated:

I want to go back a bit in history, back to an idea of an ordered society. There will always be strong people there will always be weak people, there will always be protected people, there will always be unprotected people. The idea in any ordered society is to protect the weak and curb the strong.

In an ordered society, ladies and gentleman, you can do anything that you desire so as long as it doesn't endanger or infringe on the rights of others.

---

**51.** Appellant also contends that the prosecutor misled the jury by improperly arguing that Appellant's age did not constitute a mitigating circumstance because he was not a child at the time of trial. A review of the prosecutor's closing remarks, however, does not reveal this argument. Rather, the prosecutor remarked upon Appellant's courtroom demeanor, rhetorically asking, "where was the child then," in response to defense counsel's emphasis in his closing argument of Appellant's courtroom comportment and argument that his "present age [and] present mental abilities," constituted a mitigating circumstance. The prosecutor's commentary was thus allowable as a response.

After asking the jury to find that the aggravating circumstances outweigh the mitigating circumstances, and arguing that Appellant's age did not alter such balance, the prosecutor continued:

Don't back out now, don't cop out now, stand up loud and clear. Tell Mr. Tinari, tell this defendant, the great society is dead; when someone or any member of this community strikes in a fashion that you did, Mr. Hughes, we will not stand for it. We will not issue another chance.

Contrary to Appellant's argument, the remarks of the prosecutor did not attempt to expand the jury's focus outside the aggravating circumstances, but rather, were centered upon the circumstances of the offense—a murder committed during the perpetration of a felony. Moreover, the prosecutor's efforts were designed to counter trial counsel's mitigation argument that was premised upon Appellant's age and intellectual functioning. As such, we are unable to conclude that the comments were unduly prejudicial. Appellant nonetheless asserts that the prosecutor's statement that the jury should return a death sentence to send a message to defense counsel penalized Appellant for exercising his right to counsel. Similarly, Appellant contends that the prosecutor improperly told the jury that Appellant, through his words, had forfeited his right to be called among the living, urging the jury to return the death penalty as punishment for Appellant's assertion of his constitutional right to testify. The reference to Appellant's words obviously concerned the inculpatory statements he gave to the police, which were central to the Commonwealth's proof.

Appellant, moreover, mischaracterizes the prosecutor's closing. With respect to the reference of sending a message to trial counsel, the prosecutor was responding to trial counsel's closing.[52] As to the reference to Appellant's words, the prosecutor stated:

**52.** While it is possible to draw the same comparison between the prosecutor's argument and the "send a message" arguments that this Court has criticized, *see, e.g., Commonwealth v. Crawley,* 514 Pa. 539, 559, 526 A.2d 334, 344 (1987) (stating that "[i]t is extremely prejudicial

We are not standing here, ladies and gentleman, asking you for any kind of vengeance. What we are asking you to do, ladies and gentleman, is to look at the facts. Look at the facts, and in looking at the facts, ask yourselves this question: Hasn't, then, this defendant, through his actions, through his words, through his deeds, forfeited his right to be called among the living? And you do this according to law.

Appellant also argues that the prosecutor urged the jury to impose the death penalty because the offense was "gruesome," which is not an aggravating circumstance. As noted, the prosecutor did mention that the circumstances of the offense were gruesome; however, he did not urge the imposition of the death penalty based upon such consideration.

Finally, Appellant contends that the prosecutor impermissibly interjected factors extraneous to the death penalty statute by emphasizing the victim's youth/age and by relying upon Biblical authority as a basis for imposing death. Appellant's argument centers upon the following:

And I bring to your mind at this point, ladies and gentlemen, what is written: When I was a child, when I was playing as a child, I acted as a child; but when I became a man, I gave up childish pursuits.

\* \* \*

It is written, Inasmuch as ye do this to the least of thine children, you do it unto me.

Who are the least of these? A nine-year-old girl who was on her way to school? Who are the least of these? A nine-

for a prosecutor to exhort a jury to return a death sentence as a message to the judicial system or its officers"), the same precedent has distinguished instances in which the prosecutor asked the jury to send a message to the defendant from those where the prosecutor asked the jury to send a message to the judicial system. *See DeJesus,* 580 Pa. at 322–23, 860 A.2d at 114 (citing *Peterkin,* 538 Pa. at 471, 649 A.2d at 129). In the former circumstance, the prosecutorial comment has been tolerated. *See id.* Here, the remarks were to Appellant and counsel

year old? Is she attractive? Is she provocative? Maybe he would use that as an excuse.

Who are the least of these? That she foolishly followed him, that he drug her, that he induced her, that he enticed her? Who are the least of these? A girl or a nine-year-old girl has two things to do in life. One is to be a nine-year-old girl. The other is to grow up to be a woman. This was taken away.

Notably, immediately following these remarks, the prosecutor cautioned the jury that he was not seeking vengeance, but asking the jury to look at the facts and determine whether the defendant had forfeited his right to life according to the law.

As acknowledged by Appellant, at the time of his trial, the death penalty statute did not contain an aggravating circumstance based upon the age of the victim. *See* Act of Dec. 22, 1989, P.L. 727, No. 99, § 2 (adding subparagraph (16) to Section 9711(d), providing as an aggravating circumstance where the victim was a child under 12 years of age). While the prosecutor repeatedly referenced the victim's age during his argument, this fact was in evidence and had been referred to throughout the trial. More important, the prosecutor did not urge the jury to return a death sentence based upon the victim's age; instead, as noted, he requested that it weigh the mitigating and aggravating circumstances.[53]

Moreover, although this Court has announced a *per se* rule prohibiting reliance upon the Bible to support the imposition of the death penalty, *see Commonwealth v. Chambers*, 528 Pa. 558, 586, 599 A.2d 630, 644 (1991), this rule was not in effect at the time of Appellant's trial, and trial counsel cannot be deemed ineffective for failing to anticipate a change in the law. *See Commonwealth v. Copenhefer*, 553 Pa. 285, 315, 719 A.2d 242, 257 (1998) (citing *Commonwealth v. Cook*,

and, as noted, were directed at responding to the defense mitigation argument.

53. Appellant also asserts that mentioning the victim's age was particularly inflammatory in light of the disappearances and murders of African–American children occurring in Atlanta at the time of Appellant's trial. The existence of these events in another jurisdiction, however, did not serve to preclude the prosecution from remarking upon the circumstances surrounding the murder in the present matter.

544 Pa. 361, 384, 676 A.2d 639, 651 (1996)). Absent the *per se* rule, the argument is subject to assessment for its prejudicial effect, with counsel's conduct evaluated accordingly. In this regard, a prosecutor is permitted to employ oratorical flair during a closing argument and is afforded a greater degree of latitude in the context of a penalty phase, as the presumption of innocence is no longer applicable. *See Commonwealth v. Ligons,* 565 Pa. 417, 430, 773 A.2d 1231, 1238 (2001). With respect to Biblical references, at the time of Appellant's trial, this Court treated such commentary as falling narrowly within the limits of the oratorical flair permitted to a prosecutor arguing for the death penalty. *See Stokes,* 576 Pa. at 308, 839 A.2d at 231–32; *Chambers,* 528 Pa. at 568, 599 A.2d at 644.[54] Given such treatment and taking into consideration that the prosecutor stressed that he was not asking for vengeance, and that the jurors make their determination based upon the facts and the law, we decline to conclude that Appellant suffered prejudice sufficient to establish ineffective assistance of counsel.

Appellant further contends that the penalty phase jury instructions unconstitutionally advised the jury that they had to unanimously agree upon a mitigating circumstance before giving it effect in violation of *Mills v. Maryland,* 486 U.S. 367, 375, 108 S.Ct. 1860, 1865–66, 100 L.Ed.2d 384 (1988). In support, Appellant argues that instructions that are "materially identical" to those given in this case have been found by the federal courts to have violated the rule in *Mills. See, e.g., Frey v. Fulcomer,* 132 F.3d 916, 922–24 (3d Cir.1997). The decision in *Mills* was issued on June 6, 1988, approximately seven years after Appellant's trial, Appellant's judgment did not become final, however, until June of 1989, after expiration of the period for petitioning the United States Supreme Court for *certiorari. See* 42 Pa.C.S. § 9545(b)(3). Furthermore, the decision in *Mills* has been deemed a new rule that cannot be retroactively applied to cases in which the judgment became final before the decision was issued. *See Beard v. Banks,* 542

54. *Stokes* involved the same prosecutor and a very similar Biblical reference respecting the age of the victim.

U.S. 406, ——, 124 S.Ct. 2504, 2513, 2515, 159 L.Ed.2d 494 (2004). That being the case, *Mills* could have been applied to Appellant's direct appeal, had the issue been properly preserved for review. *See* 42 Pa.C.S. § 9544(b) (defining waiver under the PCRA and explaining that an issue is waived if it could have been raised, *inter alia,* on appeal); *cf. Commonwealth v. Cabeza,* 503 Pa. 228, 233, 469 A.2d 146, 148 (1983) (holding that, new rules will be applied retroactively to cases where the issue has been preserved).

In this regard, Appellant advances an assertion of ineffectiveness in an attempt to avoid a finding of waiver of this constitutional claim. *See generally Commonwealth v. Wallace,* 555 Pa. 397, 406, 724 A.2d 916, 921 (1999) (noting that, in the context of a properly pleaded and supported claim of ineffectiveness, the merits of the underlying claim may be addressed and waiver avoided). As noted, the decision in *Mills* constituted a new rule or change in the law, and counsel cannot be deemed ineffective for failing to anticipate such a change. *See Commonwealth v. Gibson,* 547 Pa. 71, 105, 688 A.2d 1152, 1169 (1997). *Mills* was issued, however, while Appellant's direct appeal was pending, although after briefs had been filed and the case had been submitted for disposition. Appellant argues that, under the then-available relaxed waiver rule, counsel could have raised the issue in this Court. Assuming, given the procedural posture of the case, that prior counsel could have raised the *Mills* issue, this Court has declined to be bound by the Third Circuit's holding in *Frey,* which, as noted, addressed a similar jury instruction respecting the finding of mitigating circumstances. *See Commonwealth v. Breakiron,* 556 Pa. 519, 537 n. 7, 729 A.2d 1088, 1097 n. 7 (1999); *Commonwealth v. Cross,* 555 Pa. 603, 612–14, 726 A.2d 333, 337–38 (1999). Consequently, Appellant is not entitled to relief on this issue.

█ Appellant did not testify during the penalty phase and, as a result, the trial court cautioned the jury that:
You should not decide out of any feeling of vengeance or prejudice toward the defendant. Bear well in mind that he did not take the stand during the penalty stage at this

juncture, and you are not to infer any guilt from the fact of his having remained silent and asserting his Fifth Amendment rights, as you were heretofore advised.

Emphasizing the references that the jury should "bear well in mind" that the defendant did not testify, and that they should not infer "guilt" from such fact, Appellant presently argues that the instruction invited the jury to use his silence against him at sentencing by inferring that he was hiding something relative to the existence, non-existence, or relative weight of aggravating and mitigating circumstances. Here, the instruction paralleled the no-adverse-inference charge that is now required, absent express waiver, in the guilt-phase where a defendant does not testify. *See, e.g., Commonwealth v. Thompson,* 543 Pa. 634, 640–44, 674 A.2d 217, 220–22 (1996). At the same time, the court's instruction may have been better phrased with reference to the jury's role in the sentencing determination, for instance, the court could have explained that the jurors may not infer the existence of any aggravating circumstance or decline to find any mitigating circumstance based upon Appellant's failure to testify. Nevertheless, we decline to conclude that the inexact reference to guilt in this circumstance was prejudicial. *Cf. Commonwealth v. Faulkner,* 557 Pa. 531, 539, 735 A.2d 67, 71 (1999) (discussing the cognizability of an ineffectiveness claim under the Post–Conviction Relief Act in terms of whether it affected Appellant's "guilt of the death penalty").

■ Appellant also challenges the trial court's curative instruction concerning the meaning of a life sentence, which was issued in the following context:

[Defense Counsel]: life imprisonment is not something that is easy. It means his entire life is spent under the custody and in the custody of the authorities—

[Assistant District Attorney]: Objection. I would request a curative instruction.

[The Court]: Whether or not a sentence of life means the duration of a person's life is an inquiry that you should not concern yourselves with.

The description with respect to the duration of the sentence imposed for a term of life by any court or a Judge in this Commonwealth of Pennsylvania, the length of same is not a judicial decision. The length of a life sentence is determined by the executive branch of government, which appoints the State Board of Pardon and Parole.

In any event, you are not to concern yourselves with what the meaning of a life sentence is in reaching a determination. Set that aside. You are to deliberate and determine whether the proper punishment is life imprisonment or death, not concerning yourselves with the question of whether life is life, or life is less than life.

Appellant raises two distinct claims respecting this instruction, initially asserting that it misled the jury both as to the meaning of a life sentence and its sentencing role by incorrectly indicating that he would be eligible for parole. At the time of Appellant's trial, however, where an issue arose concerning the length of the life sentence, the court was obligated to advise the jury that they should not concern themselves with whether a defendant sentenced to life imprisonment might be paroled. *See Commonwealth v. Edwards*, 521 Pa. 134, 158–59, 555 A.2d 818, 830–31 (1989). In this case, although the trial court's instruction could have been better phrased and more concise, it was consistent with existing authority. Thus, counsel cannot be deemed ineffective for failing to object.

Appellant also suggests that the instruction was prejudicial because the prosecutor argued future dangerousness to the jury, and thus the court was required to instruct the jury, consistent with *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), that Appellant would be ineligible for parole if sentenced to life imprisonment. At the time of Appellant's trial, juries were prohibited from receiving information concerning parole, pardon, and commutation. *See Commonwealth v. Henry*, 524 Pa. 135, 160, 569 A.2d 929, 941 (1990). Furthermore, *Simmons* was not issued until five years after Appellant's conviction became final, and it has been interpreted as creating a new rule of law. *See O'Dell v. Netherland*, 521 U.S. 151, 153, 117 S.Ct. 1969, 1971, 138

L.Ed.2d 351 (1997). As counsel cannot be deemed ineffective for failing to anticipate a change in the law, the failure to request an instruction in this case does not constitute a ground for relief. *See Commonwealth v. Christy,* 540 Pa. 192, 217, 656 A.2d 877, 889 (1995).

Appellant additionally argues that the trial court unconstitutionally instructed the jury that capital punishment is the American way, and that although trial counsel objected to the instruction, he failed to pursue the issue on direct appeal. During his closing remarks, trial counsel argued:

> Our system doesn't say that what we must do is an eye for an eye and a tooth for a tooth, that we must avenge the death of one by killing another person. That isn't the system of a civilized society, especially when you are talking about a person of Kevin Hughes' being.

> \* \* \*

> I suggest to you, without elaborating any further, that the time has come for you to make your determination that death for death is not the proper way, it's not the American way.

Responding to such commentary, the trial court advised the jury:

> Bear well in mind that there was a reference in argument that the death penalty is not the American way of life. Such an assertion is inconsistent with the present status of the law in the Commonwealth of Pennsylvania and in these United States of America.

> In the quintuplet number of decisions recently decided by the United States Supreme Court, in Washington, the Court made the observation that at least 33 of the General Assembly's and the legislative bodies throughout the States of these United States, there being 50 states, had adopted laws calling for the capital punishment in criminal proceedings involving various forms of homicide.

> Likewise, the eminent judicial body in these United States of America, in a decision handed down some 4 or 5 years

ago, found that capital punishment is not cruel and unusual punishment within the ambit of the Eighth Amendment, and that the States could enact legislation calling for the imposition of capital punishment, provided that proper standards and guidelines were set forth to govern the exercise of discretion by jurors in reaching a decision respecting capital punishment.

So, to assert that capital punishment is not the American way is a statement which at this time in our society is a totally inaccurate depiction of the legal stature of capital punishment judicially, socially, and otherwise in Pennsylvania and America.

Contrary to Appellant's contention, the instruction was not an endorsement of the death penalty, but rather, a response to counsel's argument. Nor did the instruction absolve the jury from its responsibility in determining the existence of aggravating and mitigating circumstances.

 Appellant next contends that he was incompetent during post-verdict motions and on direct appeal and, as a result, that he is entitled to file new post-trial motions and a new direct appeal, *nunc pro tunc*. Appellant frames this claim in the alternative, in the first instance, maintaining that prior counsel was ineffective in failing to apprehend and discover evidence of Appellant's condition. Alternatively, Appellant argues that the Commonwealth was in possession of evidence of his incompetence through the records maintained by the Department of Corrections, specifically, mental health records. In support of his claim, Appellant cites to affidavits of family members, indicating that he continued to suffer from delusional beliefs that he would be sent home, and prison records indicating that Appellant exhibited psychotic behavior, was severally mentally disabled, and had been involuntarily committed under the Mental Health Procedures Act on repeated occasions. Furthermore, Appellant references an affidavit from a psychiatrist, Robert A. Fox, M.D., stating that he was incompetent during the timeframe covering post-trial motions and direct appeal.

■ Where a defendant seeks to forego further appellate or collateral proceedings, a determination of his competence to waive his rights is appropriate. *See Rees v. Peyton*, 384 U.S. 312, 313–14, 86 S.Ct. 1505, 1506, 16 L.Ed.2d 583 (1966) (*per curiam*); *Commonwealth v. Fahy*, 549 Pa. 159, 163, 700 A.2d 1256, 1258 (1997). Similarly, there may be instances where the disposition of an appeal is improper if the defendant was not competent to consult with counsel in its preparation. *See generally Commonwealth v. Silo*, 469 Pa. 40, 42, 364 A.2d 893, 894–95 (1976) (*per curiam*). Here, Appellant did not seek to discontinue his direct appeal or collateral review, and there is no indication that counsel's preparation of the direct appeal was hampered by his inability to communicate with Appellant. Consequently, Appellant has failed to make a sufficient proffer concerning prejudice.[55]

■ Finally, Appellant argues that counsel was ineffective for failing to investigate, develop, and present substantial mitigation, in particular, evidence concerning mental illness, brain injury, and his traumatic childhood. With respect to the mental health evidence, Appellant cites to, *inter alia:* Dr. Camiel's initial evaluation in April of 1980, which indicated "a possibility of a major mental illness, most likely of a psychotic depressive or schizophrenic form"; a report from a Philadelphia prison psychiatrist, Arthur D. Boxer, M.D., from April of 1980, noting that Appellant was out of contact with reality, confused and rambling, and exhibited "neurological appearing symptoms"; a mental health evaluation prepared by Gino Grosso, M.D., in July of 1980, referencing Appellant's prior psychiatric commitment in 1977 and noting that he was in a confused and catatonic state; the competency hearing testimony of Dr. Blumberg, who concluded that Appellant was "detached from reality" and was "profoundly disturbed"; and the

---

55. Appellant alternatively frames this claim as a constitutional due process violation based upon the Commonwealth's obligation to disclose exculpatory evidence. In this regard, Appellant relies upon *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), maintaining that evidence of his mental illness was in possession of the Commonwealth, specifically, the Department of Corrections, and therefore should have been disclosed. Given our disposition, however, it is not necessary to address this claim.

opinion of Dr. Saul, who diagnosed Appellant as having a psychotic illness, namely, schizophrenia. In addition, Appellant has submitted affidavits from Patricia Fleming, a clinical psychologist, who interviewed Appellant, and administered psychological and neuro-psychological tests, and opined that Appellant is psychologically, emotionally, and cognitively impaired, and has been so throughout his life as a result of childhood trauma, major mental illness in the form of schizophrenia, and organic brain damage. Dr. Fleming characterized Appellant as suffering from an extreme mental and emotional disturbance. Appellant also submitted an affidavit from Robert A. Fox, M.D., a psychiatrist, who diagnosed Appellant as suffering from schizophrenia, a major mental illness, and thought disorder. According to Dr. Fox, Appellant suffered from schizophrenia and brain damage during his entire life, including the time of the offense.

Apart from the mental health evidence, Appellant also proffers evidence regarding his traumatic childhood, which he claims was marked by severe privation and physical and mental abuse. Specifically, Appellant offers affidavits from family members, who would testify that Appellant's mother, Rebecca Bunn, suffered from schizophrenia and was a chronic substance abuser, spent any available money on drugs and alcohol, encouraged her children to use drugs, forced them to buy drugs for her, and disappeared for weeks at a time. In addition, the affidavits indicate that Ms. Bunn sexually abused Appellant, maintained relationships with various men who both physically and sexually abused Appellant, and attempted to commit suicide a number of times in the presence of her children. The affidavits reference an occasion when Appellant and a younger brother overdosed on Ms. Bunn's pills and were hospitalized. The affidavits also assert that Appellant was abandoned when Ms. Bunn moved to California, and that he and his siblings were removed by California Children and Youth Services and placed in foster care until being returned to the care of Appellant's grandmother in Philadelphia. According to the affidavits, upon returning, Appellant and the

other children were exposed to a violent and chaotic household, beaten with electrical cords, and mentally abused.

The Commonwealth responds that such proof is merely a greater quantity of similar evidence that was presented during the penalty hearing. In this respect, the Commonwealth emphasizes trial counsel's incorporation into the record of the penalty phase certain facts and testimony from the guilt phase, in particular, that: Appellant was 16 years of age, 11 months and several days short of his 17th birthday; had come to Philadelphia as a result of leaving California after being abandoned by his mother; had lived with his uncles and his grandmother; acted as a child with the mentality of a 2–year old; and had limited reading and writing abilities. Furthermore, the Commonwealth notes that counsel incorporated the testimony of Dr. Wilson, who indicated that Appellant's intellectual functioning was at a low average level, his reflective and cognitive skills were lacking, his academic achievement was at an elementary level, he was illiterate, his thinking was concrete and like that of a young child, and that mild brain damage could not be ruled out.

The PCRA court concluded that trial counsel presented the mental health evidence that he had available at the time, and that the jury was provided with sufficient information regarding Appellant's mental health to either accept or reject as a mitigating circumstance. The court explained that it was not persuaded that additional mental health evidence would have altered the jury's findings, and noted that the reports relied upon by Appellant and his PCRA petition were prepared years after the murder and could not be deemed "conclusive with regard to proceedings that occurred 20 years ago."

In general, counsel has an obligation to conduct reasonable investigations or reach reasonable decisions that make a particular investigation unnecessary. *See Strickland v. Washington*, 466 U.S. 668, 691, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984); *Commonwealth v. Basemore*, 560 Pa. 258, 289, 744 A.2d 717, 735 (2000). In the context of the penalty phase of a capital case, counsel has a duty to thoroughly

investigate a defendant's background, *see Williams v. Taylor*, 529 U.S. 362, 396, 120 S.Ct. 1495, 1515, 146 L.Ed.2d 389 (2000), including the obligation " 'to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.' " *Wiggins v. Smith*, 539 U.S. 510, 524, 123 S.Ct. 2527, 2537, 156 L.Ed.2d 471 (2003) (quoting ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES 11.4.1(C), p. 93 (1989)).[56] The reasonableness of a particular

**56.** Concerning counsel's obligations relative to the penalty phase, the Concurring and Dissenting Opinion criticizes reliance upon the standards discussed in *Strickland, Williams*, and *Wiggins*, emphasizing that these decisions had not been issued at the time of Appellant's trial. *See* Concurring and Dissenting Opinion, *op.* at 824–25. As here, however, the rulings in those cases were issued in the context of collateral review, occurring many years after trial. *See Wiggins*, 539 U.S. at 514, 518, 123 S.Ct. at 2532, 2534; *Williams*, 529 U.S. at 368, 372, 120 S.Ct. at 1500, 1502; *Strickland*, 466 U.S. at 678, 104 S.Ct. at 2059. Therefore, there was no more attempt in those decisions to innovate new law in the disposition of the appellants' substantive claims than there is here. Furthermore, well before Appellant's trial, the ability to present information respecting a defendant's background, character, and the circumstances of the offense was considered a constitutional constituent to a valid capital sentencing scheme, *see Lockett v. Ohio*, 438 U.S. 586, 602–05, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978), and the significance of counsel's role in evaluating this information had been recognized as essential. *See Gardner v. Florida*, 430 U.S. 349, 360, 97 S.Ct. 1197, 1206, 51 L.Ed.2d 393 (1977). Certainly, it cannot be reasonably maintained that counsel could fulfill his obligation by conducting little or no investigation into an available area of mitigation, particularly when such omission may be of critical consequence to the penalty imposed. Indeed, the very standards relied upon in *Strickland* as guideposts in assessing counsel's performance at a trial occurring in 1976, in *Williams* regarding a trial conducted in 1986, and in *Wiggins* involving a trial held in 1989, provided that:

It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.

ABA STANDARDS FOR CRIMINAL JUSTICE 4–4.1 (2d ed. 1980) (The Defense Function; Investigation and Preparation). Of equal import, the commentary following the standard explains that:

The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing. This cannot effectively be done on the basis of broad general emotional appeals or on the strength of statements made to the lawyer by the defendant. Information concerning the defendant's background, education, employment record, mental and

investigation depends upon evidence known to counsel, as well as evidence that would cause a reasonable attorney to conduct a further investigation. *See id.* at 527, 123 S.Ct. at 2538. At the same time, counsel's obligations do not require an investigation into "every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Id.* at 533, 123 S.Ct. at 2541.

Presently, the record indicates that counsel was aware of Appellant's mental illness; indeed, counsel's efforts during the course of the competency proceedings confirm as much. Notably, during the second competency proceeding, counsel acknowledged consulting with Dr. Blumberg for purposes of a possible defense. Furthermore, the testimony of Appellant's grandmother during the transfer proceeding and the testimony of Appellant's uncle at trial should have prompted counsel's awareness, to some degree, of Appellant's difficult childhood.[57] However, the record does not indicate the degree of counsel's awareness or, more important, whether the decision to forego presentation of such evidence was premised upon strategic or tactical concerns. *Cf. Bell v. Cone,* 535 U.S. 685, 699–702, 122 S.Ct. 1843, 1852–54, 152 L.Ed.2d 914 (2002) (discussing, *inter alia,* trial counsel's tactical decisions in limiting the penalty-phase presentation).

While the evidence proffered by Appellant in his PCRA petition overlaps, to some degree, with that presented by counsel when he incorporated certain testimony from the guilt

> emotional stability, family relationships, and the like will be relevant, as will mitigating circumstances surrounding the commission of the offense itself. Investigation is essential to fulfillment of these functions.
>
> ABA STANDARDS FOR CRIMINAL JUSTICE 4–4.1, cmt. Indeed, the ABA standards quoted above have been in place since 1971. *See* ABA PROJECT ON STANDARDS FOR CRIMINAL JUSTICE, STANDARDS RELATING TO THE DEFENSE FUNCTION § 4.1 (1971).
>
> In light of the foregoing, the textual reference (above) to counsel's duty to investigate as part of his penalty phase preparation does not constitute a retroactive application of a new standard.

**57.** We acknowledge that a different attorney represented Appellant at the transfer hearing; nevertheless, even assuming the absence of any communication on this subject between counsel, the notes of testimony from that proceeding were available prior to trial.

phase, in particular, Appellant's low level of intellectual functioning and the possible existence of a brain injury, the current proof is substantially different. Here, there is evidence of chronic schizophrenia, a major mental illness and thought disorder, as well as expert testimony allegedly confirming the existence of a brain injury. This proof, if believed, would have been sufficient to implicate the mental-health mitigators, namely, that Appellant was under the influence of an extreme mental or emotional disturbance, and that his capacity to appreciate the criminality of his conduct or conform it to the requirements of the law was substantially impaired, see 42 Pa.C.S. § 9711(e)(2), (3), and, in any event, would have been admissible under the catch-all circumstance. Cf. Basemore, 560 Pa. at 292–93, 744 A.2d at 737. Of equal import, the evidence concerning Appellant's traumatic childhood is considerably more detailed than that briefly alluded to by Appellant's uncle at trial. Consequently, we do not view the current proof as merely cumulative of that previously presented. In this regard, it is notable that the penalty-phase determination is a qualitative one, see Commonwealth v. Miller, 572 Pa. 623, 647, 819 A.2d 504, 518 (2002), in which the weight and detail of a particular presentation is likely to impact upon the deliberative process.[58] In light of such evidence, a genuine factual dispute exists with respect to counsel's awareness of the proof, the nature and extent of his investigation, and whether the decision to not present the evidence was founded upon reasonable strategic concerns. See Commonwealth v. Stanley, 534 Pa. 297, 301, 632 A.2d 871, 872 (1993). Thus, an evidentiary hearing is required to allow Appellant to develop this claim and to assess the reasonableness of counsel's actions.

Accordingly, the order of the PCRA court is vacated and the matter is remanded for additional proceedings consistent with this opinion.

Justice CASTILLE files a concurring and dissenting opinion in which Justice EAKIN joins.

58. Notably, the jury did not find any mitigating circumstances.

Justice CASTILLE, concurring and dissenting.

I agree that appellant is not entitled to Post Conviction Relief Act ("PCRA")[1] relief on his pre-trial or guilt phase claims, albeit I do not agree with the Majority's non-waiver approach to two of those claims. With respect to the penalty phase, I agree that appellant is entitled to a remand on his claim that counsel was ineffective respecting mitigation evidence, but unlike the Majority, I would make clear that counsel's conduct must be evaluated according to the governing law in 1981, and not in light of later-announced standards. I am in dissent as to the scope of the penalty phase remand because I respectfully disagree with the decision to remand appellant's claim of ineffective assistance of appellate counsel in failing to challenge the trial court's ruling on the Commonwealth's rebuttal evidence. Furthermore, I have other concerns respecting the proper approach to certain of appellant's penalty phase claims. I write to address these various points of divergence.

First, with respect to appellant's multi-faceted claim involving his mental competence to face trial, the Majority correctly holds that appellant's competency claim is previously litigated, and then turns to the "different issue" appellant raises concerning the standard for assessing proof respecting competency. Op. at 778. The Majority notes that the question of whether a defaulted claim of incompetence *qua* incompetence may be deemed waived under the PCRA has divided this Court, with no majority view emerging to date. Op. at 778–79, *citing Commonwealth v. Santiago*, 855 A.2d 682 (Pa.2004) (plurality opinion by Cappy, C.J.). Based upon the inconclusive outcome in *Santiago*, the Majority avoids the question of whether appellant's distinct claim involving the standard for evaluating competency is waivable; instead, the Majority assumes that relaxed waiver applies and proceeds to evaluate the merits. I continue to believe that which I explained in my concurrence in *Santiago: i.e.,* that the PCRA does not except competency claims from its waiver provision; that this Court lacks authority to ignore the legislative waiver provision and

---

1. 42 Pa.C.S. § 9541 *et seq.*

should not invent an exception for competency claims; and that our creating a relaxed waiver exception for competency claims runs afoul of the seminal decision in *Commonwealth v. Albrecht*, 554 Pa. 31, 720 A.2d 693 (1998), which eliminated the relaxed waiver rule on capital PCRA review precisely because that judicial rule wrongly subverted the PCRA's statutory waiver. There is no more reason to marginalize *Albrecht* and employ relaxed waiver to reach appellant's defaulted claim concerning the competency standard than there is to reinvigorate relaxed waiver to reach substantive claims of incompetency. Indeed, since none of the authorities cited in the *Santiago* plurality addressed claims involving the **standard** for assessing competency, there is far less reason to resurrect an arbitrary judicial doctrine to void a presumptively valid statutory waiver.

By employing relaxed waiver, the Majority engages in an unnecessary consideration of the retroactive effect of the then-new federal constitutional rule emerging from *Cooper v. Oklahoma*, 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996), which as of today provides the standard for assessing competence. *See* op. at 778–81. Even if I could accept the *Santiago* proposed return to relaxed waiver for competency claims, I would not extend that doctrine to encompass defaulted claims involving the competency standard. Relaxed waiver in this instance would permit a new constitutional rule issued by the U.S. Supreme Court to operate retroactively on collateral review, even though the High Court has not required the rule to have such a super-retroactive application. Both this Court and the Supreme Court already have a settled, principled approach to rules deemed subject to retroactive application: such new rules should apply to cases still pending on direct review, but only where the defendant timely raised and preserved the claim; but they should apply if raised for the first time on collateral attack only in those truly rare instances where the U.S. Supreme Court has explicitly required that application. *See Shea v. Louisiana*, 470 U.S. 51, 58 n. 4, 105 S.Ct. 1065, 1069 n. 4, 84 L.Ed.2d 38 (1985) (where constitutional decision applies retroactively, it must be applied to cases

pending on direct review at time of issuance, but "subject, of course, to established principles of waiver, harmless error, and the like"); *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion) (discussing limits on applying new rules to review of state trials on federal habeas corpus attack); *Commonwealth v. Tilley,* 566 Pa. 312, 780 A.2d 649, 652 (2001) (discussing requirement that novel issue be preserved); *Commonwealth v. Cabeza,* 503 Pa. 228, 469 A.2d 146, 148 (1983) (same).

It is one thing to overlook a procedural waiver where the foregone claim involves settled law, but quite another to do so to allow a new rule of law to impeach the fairness of a trial and a judgment that has become final, and properly so, under the law in existence when the trial occurred. In this regard, it is notable that, for purposes of federal habeas corpus review of state convictions, the U.S. Supreme Court has held that the fact that this Court employed relaxed waiver to reach a claim arising under *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), which was not preserved when the case was tried pre-*Mills,* did not absolve the Third Circuit from having to determine whether *Mills* should properly be deemed retroactively applicable. *See Horn v. Banks,* 536 U.S. 266, 122 S.Ct. 2147, 153 L.Ed.2d 301 (2002) (*per curiam*). In a later appeal in the *Banks* case, the High Court reversed the Third Circuit a second time, holding that *Mills* was a new procedural rule; that it was not subject to retroactive application on collateral attack; and thus it could not be employed to overturn a Pennsylvania conviction which was secured before *Mills* was decided. *See Beard v. Banks,* 542 U.S. 406, 124 S.Ct. 2504, 159 L.Ed.2d 494 (2004). I think this Court should employ a similar approach: a new rule of federal constitutional law should be deemed retroactively applicable on PCRA review only in instances where the U.S. Supreme Court would require that result. This case does not pose such an instance.

On the merits, even if I were willing arguably to agree that this waived claim was not waived, I do not follow the Majority's analysis in its entirety. Taking the *Santiago* plurality's relaxed waiver approach to its logical conclusion in this exten-

sion/application, we are now supposed to treat appellant's claim as if it was not waivable, and therefore, he is entitled to pursue it here as if this was effectively a continuation of his direct appeal. Under direct review retroactivity principles, appellant would generally be entitled to the benefit of the new rule in *Cooper* if he had anticipated it and asked for it, even if the rule had not been embraced at the time he was tried. It is hard to grasp why the Majority ultimately denies appellant any benefit of *Cooper* if we are indulging the pretense that he did not waive his right to pursue the new rule on direct review. In other words, the ultimate holding that follows upon the Majority's retroactivity analysis appears to be that appellant waived his supposedly non-waivable *Cooper* claim. It would be better simply to apply the statute according to its actual language and rational structure; recognize that the competency standard claim is waivable and was in fact waived here; decline to convert appellant's claim of counsel ineffectiveness into the underlying waived claim; and dispose of the ineffectiveness claim—which is cognizable and not waived—on the merits by applying settled law which holds that counsel cannot be deemed ineffective for failing to predict the change in the law represented by *Cooper*. *See, e.g., Commonwealth v. (Aaron) Jones*, 571 Pa. 112, 811 A.2d 994, 1005 (2002); *Commonwealth v. Rollins*, 558 Pa. 532, 738 A.2d 435, 451 (1999).

Second, of necessity I must disagree with the Majority's decision to nullify the PCRA's waiver provision to reach the merits of appellant's claim premised upon *Riggins v. Nevada*, 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992)—another decision which did not exist until years after appellant's trial and direct appeal had concluded. In addition to assuming that *Riggins* claims are not waivable, the Majority assumes that *Riggins* is subject to super-retroactive application on PCRA review. Op. at 783. Again, the U.S. Supreme Court has had little difficulty in concluding that new rules generally should not apply when they are defaulted on direct review and invoked for the first time upon collateral attack. *See generally Shea v. Louisiana, supra.* In my view, the likelihood that the High Court would ever issue the extraordinary holding

that the *Riggins* rule must be deemed to apply retroactively not only to preserved claims on direct appeal, but also to waived claims raised for the first time upon state collateral attack falls squarely on the "none" end of the "slim and none" continuum. With the Supreme Court not yet having issued such a remarkable ruling, this defaulted claim, like the defaulted *Cooper* claim, should be treated as the ineffective assistance of counsel claim that it actually is. I would then hold that counsel cannot be deemed ineffective for failing to predict the decision in *Riggins*. *(Aaron) Jones, supra; Rollins, supra.*[2]

Third, I respectfully disagree with the Majority's disposition of appellant's claim of ineffective assistance of counsel premised upon the trial court's penalty phase ruling that the Commonwealth could rebut defense mitigation evidence with evidence concerning a knifepoint sexual assault appellant committed on a minor female when he was a juvenile, an assault which resulted in a consent decree disposition. Op. at 792–97. The Majority finds arguable merit in the claim that counsel should have challenged the trial court's rebuttal ruling on direct appeal. The Majority reasons that a consent decree is not the equivalent of a prior conviction or juvenile delinquency adjudication for purposes of rebutting the defense invocation of the lack of significant history of prior criminal convictions mitigating circumstance, *see* 42 Pa.C.S. § 9711(e)(1); and thus, the trial court erred in ruling that the facts underlying the consent decree would be admissible to rebut that mitigating circumstance. In so holding, the Majority rejects the PCRA court's view that this Court's reasoning in *Commonwealth v. Stokes,* 532 Pa. 242, 615 A.2d 704, 714 (1992), which upheld the admission of rebuttal evidence of juvenile delinquency adjudications in a similar circumstance, would also support the admission of evidence concerning a juvenile crime which re-

2. There is no harm to the PCRA petitioner in holding waived claims of this ilk to be waived. In the event that the U.S. Supreme Court, or this Court, were to hold that a new constitutional rule is so fundamental as to warrant super-retroactive application on collateral attack, the PCRA specifically deems such claims to be cognizable as exceptions to the PCRA time-bar. See 42 Pa.C.S. § 9545(b)((1)(iii)). The High Court has never held that *Riggins* is such a watershed rule.

sulted in a consent decree. Op. at 793–94. The Majority remands this claim for a hearing on reasonable basis and prejudice. *Id.* at 797.

The difficulty with the Majority's approach is that it pays no heed to the governing law requiring that counsel is presumed to be effective and that we assess counsel's conduct in light of the *Strickland*[3] requirement of contemporary assessment, *i.e.,* that we evaluate counsel's conduct according to the law in existence at the time counsel had to act.[4] The requirement that counsels conduct be viewed in light of contemporaneously-governing law is central to any rational assessment of a claim of ineffectiveness.

> "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674. This is so because it is "all too tempting" for a defendant to second-guess counsel, and "all too easy" for a court to deem a particular act or omission unreasonable merely because counsel's overall strategy did not achieve the result his client desired. *Id. See also Lockhart [v. Fretwell],* 506 U.S. [364,] 372, 113 S.Ct. 838, 122 L.Ed.2d 180 [(1993)] (*Strickland* Court adopted "the rule of contemporary assessment" because it recognized that "from the perspective of hindsight there is a natural tendency to speculate as to whether a different trial strategy might have been more successful"); *Waters v. Thomas,* 46 F.3d 1506, 1514 (11th Cir.1995) ("nothing is clearer than hindsight—except perhaps the rule that we will not judge trial counsel's performance through hindsight").

*Commonwealth v. Bond,* 572 Pa. 588, 819 A.2d 33, 51 (2002). *Accord Commonwealth v. Duffey,* 855 A.2d 764, 778–79 (Pa.

---

**3.** *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**4.** I note that, in disposing of other claims on this collateral appeal, the Majority does recognize the principle of contemporary assessment. *See, e.g.,* op. at 807–08, 810.

2004) (Castille, J., joined by Eakin, J., concurring and dissenting). "Deeming counsel to be ineffective for failing to forward an objection based upon a principle of law that was not then-governing is the very essence of the sort of perverse second-guessing which is not permitted under *Strickland* and its progeny." *Duffey*, 855 A.2d at 779 (Castille, J., concurring and dissenting). Another way of stating this bedrock principle is that collateral attack is simply not the place for courts to innovate new holdings concerning trial issues, since counsel cannot be faulted for failing to predict those new rulings.

There was no controlling interpretive decisional law when this case was tried in 1981, or when counsel filed his direct appeal brief in 1987, which suggested that the trial court's rebuttal ruling was erroneous. Indeed, this collateral appeal would be the very case that would establish the novel substantive proposition that would serve as the basis for determining counsel to have been incompetent seventeen years ago. It may be that direct appeal counsel could have puzzled out the theory that the Majority has accepted, for the first time, today. But, since counsel cannot be blamed for failing to predict a decision that was still seventeen years down the appellate pike, I do not believe that counsel can be faulted for failing to pursue this claim, as opposed to the claims he actually did pursue, on direct appeal.

For similar *Strickland*-based reasons, I respectfully disagree with the Majority's finding, in relation to a separate point respecting the same rebuttal evidence claim, that counsel should have challenged the ruling on direct appeal because, according to the Majority, as a matter of law the prior juvenile assault/consent decree was inadmissible for the separate purpose of rebutting defense evidence produced under the "catch-all" mitigating circumstance set forth in 42 Pa.C.S. § 9711(e)(8). Op. at 795. The Majority holds that rebuttal evidence under the catch-all mitigator cannot concern aspects of character other than the specific aspects invoked by the defendant's mitigation evidence. But, once again, the Majority's holding on the scope of rebuttal is an innovative one which ignores the requirement of contemporary assessment. The

question of the proper scope of rebuttal evidence under the catchall mitigator apparently was an open question in 1981 and in 1987, and to the extent it is a less than open question today, that is so only because what law there is on the subject is contrary to the Majority's view.

This Court has recognized that the Section (e)(8) mitigator effectuates the U.S. Supreme Court's requirement that: "in capital cases, the sentencer [may] not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Skipper v. South Carolina*, 476 U.S. 1, 4, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) (citations omitted; emphasis original). *See Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831, 851–52 (2003); *Commonwealth v. Harris*, 572 Pa. 489, 817 A.2d 1033, 1053–54 (2002). The "character" evidence approved under Section (e)(8) has not been confined to the sort of classic character evidence deemed admissible at trial— *i.e.*, it is not limited to evidence of one's reputation in the community for pertinent character traits. *See generally Commonwealth v. Fulton*, 574 Pa. 282, 830 A.2d 567 (2003) (Opinion Announcing Judgment of Court by Castille, J.) (discussing admissibility of character evidence); Pa.R.E. 404(a)(1). The fact that appellant's mother may have abandoned him, for example, says nothing at all of his community reputation for any particular character trait. Instead, Section (e)(8) permits evidence, under the rubric of character, which is much broader and necessarily more vague. That evidence typically encompasses matters such as childhood abuse, substance abuse, mental impairments, prison adjustment, religious conversion, individual good deeds, family relations, life achievements and disappointments, *etc.* The Section thereby permits evidence which allows a fuller and more personal portrait of the defendant to appear so that the **jury** may assess his "character" for purposes of determining whether the character/record/circumstances mitigator exists. The point of pursuing the mitigator is to convince the jury that, for purposes of penalty, this particular cold-blooded murderer is at least slightly less

blameworthy than other cold-blooded murderers. Since truth is still relevant at the penalty phase, the Commonwealth is not obliged to sit idly by if false, skewed or one-sided "character" information is presented under the Section (e)(8) mitigator. Instead, it may rebut the evidence.

Although the Section (e)(8) catchall mitigator has been construed to permit a wide variety of defense evidence, it leads at best to a finding of a single statutory mitigator—*i.e.*, that the character and record of the convicted defendant, or the circumstances of his offense, should be deemed mitigating. Thus, the defendant cannot argue that each particular bit of evidence he would introduce pursuant to the Section warrants a finding of a separate statutory mitigator. Given the very broad and flexible nature of this Section, it is certainly a plausible reading of its plain language to conclude that evidence of "good" Section (e)(8) character opens the door to rebuttal evidence of "bad" Section (e)(8) character.

Even if the Court is of a mind to adopt a contrary reading, that new interpretation cannot properly form any basis for retroactively faulting counsel. This is particularly so because the Majority's narrow construction of the Section (e)(8) character evidence mitigator is inconsistent with authority from this Court on the question. In *Commonwealth v. Rice*, 568 Pa. 182, 795 A.2d 340 (2002) (plurality opinion by Newman, J.), *cert. denied*, 538 U.S. 926, 123 S.Ct. 1571, 155 L.Ed.2d 319 (2003), the appellant claimed that the trial court erred in holding that if he introduced penalty phase evidence of his "kindness in sharing a civil settlement award with his family" under the catchall mitigator, the Commonwealth could rebut with evidence of appellant's "involvement in several stabbings while in prison." The appellant there argued that the court's erroneous rebuttal evidence ruling led him not to present his available mitigation evidence. In a plurality opinion, Madame Justice Newman, joined by this Justice and Mr. Justice Eakin, summarily rejected the claim as follows:

> During the Commonwealth's case-in-chief at the penalty phase, Appellant moved *in limine* to prevent the Commonwealth from presenting evidence of Appellant's misconduct.

The Commonwealth did not attempt to introduce this evidence during its case-in-chief and planned to present these facts only in rebuttal if Appellant presented testimony of his kind and generous character. . . . **The trial court ruled that if Appellant offered evidence of his good character during his case-in-chief, then the Commonwealth would be allowed to offer evidence of Appellant's bad character during its rebuttal . . . . We conclude that the trial court did not abuse its discretion with this ruling.** Because Appellant elected not to introduce evidence of his good character, the Commonwealth did not present evidence of his prison misconduct. Consequently, because the trial court did not abuse its discretion and Appellant deliberately chose not to present evidence of his good character, we hold that Appellant is not entitled to relief.

795 A.2d at 355 (emphasis supplied) (record citations omitted). Evidence that the appellant in *Rice* was involved with prison stabbings did not contradict the proffered defense evidence that he had generously shared a civil settlement with his family. The plurality's view was that generic good character evidence opened the door to generic bad character evidence. *Rice* is in unavoidable tension with today's Majority's approach and holding. If appellate counsel in this case was incompetent in misperceiving the contours of Section (e)(8) in the 1980s, then this Court in *Rice* was no less incompetent two years ago.

Although Justice Newman's opinion in *Rice* did not command a majority, it is notable that **none** of the full complement of Justices participating in the case took issue with the plurality's disposition of this particular claim, and the Court denied penalty phase relief by a vote of 5–2. Certainly, no Justice suggested that rebuttal character evidence at the penalty phase was limited to evidence which actually rebutted the specific factual assertions proffered by the defendant concerning his character.[5]

5. Three separate responsive opinions were filed in *Rice:* a concurrence by Mr. Justice Nigro, and separate concurring and dissenting opinions by then-Chief Justice Zappala and Mr. Justice (now Mr. Chief Justice)

I continue to adhere to Justice Newman's analysis in *Rice.* However, since the constitutional test for counsel ineffectiveness requires assessment by standards in existence at the time counsel was required to make litigation decisions, it is not necessary to choose between the opposing views expressed in the *Rice* plurality in 2002 and in today's Majority Opinion. What matters is that this Court cannot deem appellate counsel incompetent for failing to forward an argument in 1987 that found no support in existing case law and which was summarily rejected—without dispute or dissenting comment—by this Court less than three years ago. I would not hold counsel to a higher standard than that which should apply to the Court itself. Accordingly, I would not remand this sub-claim to the PCRA court because, under the law in existence at the time counsel had to act, the notion that counsel was ineffective on appeal lacks even arguable merit.

I also note my respectful disagreement with the Majority's unnecessary suggestion, in remanding this claim, that "there does not appear to be a reason for counsel's failure to pursue the [rebuttal evidence] issue on direct appeal." Op. at 799. I disagree with this observation not only because an objective rational basis for counsel's decision is indeed obvious given the state of the law at the relevant time, but also because the approach it suggests does not account for the governing considerations applicable when a claim sounds in ineffective assistance of counsel on appeal. I have described those considerations as follows:

> To prove [appellate counsel] ineffective under the Sixth Amendment, PCRA counsel would have had to prove not only the underlying merit of each waived claim ... but satisfy the entire *Strickland* standard. *Smith v. Robbins,* 528 U.S. 259, 289, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000) (petitioner "must satisfy both prongs of the *Strickland* test

Cappy. Each of these opinions was confined to a separate issue concerning the jury instructions on victim impact testimony. Mr. Justice Saylor concurred in the result without opinion. Notably, Justice Nigro's concurrence stated that he "agree[d] with the Opinion Announcing the Judgment that none of the claims of error raised by Appellant warrant relief." 795 A.2d at 363 (Nigro, J., concurring).

in order to prevail on his claim of ineffective assistance of appellate counsel"); *Smith v. Murray,* 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986). Moreover, ... even identifying an issue of "arguable" merit does not prove that appellate counsel acted unreasonably, or that prejudice ensued. This is so because, as the U.S. Supreme Court has recognized, appellate counsel is not constitutionally obliged to raise every conceivable claim for relief. Counsel may forego even arguably meritorious issues in favor of claims which, in the exercise of counsel's objectively reasonable professional judgment, offered a greater prospect of securing relief. *Jones v. Barnes,* 463 U.S. 745, 750–54, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983); *see also Robbins,* 528 U.S. at 288, 120 S.Ct. 746, 145 L.Ed.2d 756 ("[A]ppellate counsel ... need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal."). "Generally, only when ignored issues are clearly stronger than those presented will the presumption of effective assistance of counsel be overcome." *Gray v. Greer,* 800 F.2d 644, 646 (7th Cir.1986) (quoted with approval in *Robbins,* 528 U.S. at 259, 120 S.Ct. 746, 145 L.Ed.2d 756).

\* \* \*

The High Court has explicitly recognized that appellate counsel is **not** constitutionally obliged to raise any and all nonfrivolous claims; to the contrary, the Court has, on repeated occasions, emphasized that vigorous, effective appellate advocacy requires the exercise of reasonable selectivity in deciding upon which claims to pursue. *Robbins,* 528 U.S. at 288, 120 S.Ct. 746, 145 L.Ed.2d 756; *Barnes,* 463 U.S. at 750–54, 103 S.Ct. 3308, 77 L.Ed.2d 987. This process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy. *Smith,* 477 U.S. at 536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (quoting *Barnes,* 463 U.S. at 751–52, 103 S.Ct. 3308, 77 L.Ed.2d 987. *See also Buehl v. Vaughn,* 166 F.3d

163, 174 (3d Cir.1999)) ("One element of effective appellate strategy is the exercise of reasonable selectivity in deciding which arguments to raise."). *Barnes* emphasized that "[t]here can hardly be any question about the importance of having the appellate advocate examine the record with a view to selecting the most promising issues for review." 463 U.S. at 752, 103 S.Ct. 3308, 77 L.Ed.2d 987.

*Commonwealth v. (Gilbert) Jones*, 572 Pa. 343, 815 A.2d 598, 613, 614 (2002) (Opinion Announcing Judgment of Court by Castille, J., joined by Eakin, J.).

Fourth, with respect to appellant's claim that his counsel was ineffective on direct appeal for not seeking leave to file a supplemental brief to raise a complaint based upon the U.S. Supreme Court's decision in *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), the Majority assumes strictly for purposes of disposition that review on direct appeal could have been secured by such a filing and by invoking relaxed waiver in the hopes of overcoming the fact that the claim was defaulted at trial. Op. at 811–12. I have no objection to assuming certain points in order to facilitate a disposition, particularly given the typically prolix filings with which this Court is burdened upon capital PCRA review. But, since this Court is likely to encounter this new type of assault upon direct appeal counsel in capital cases with increasing frequency, I believe there are two points worth making about such claims. First, even laying aside the procedural hurdle that the direct appeal in this case was already briefed and submitted when *Mills* was decided, it is pure speculation whether the Court would have entertained a particular defaulted claim based upon new constitutional authority under the discretionary relaxed waiver doctrine. Indeed, this Court has held that counsel cannot be deemed ineffective on appeal for failing to seek the retroactive benefit of a new constitutional rule that was announced while the appeal was pending, where the claim was not preserved below. *Commonwealth v. (Aaron) Jones*, 811 A.2d at 1005.

Second, there is a fundamental substantive issue that would have to be resolved in the defendant's favor before relief could

be granted upon a claim that direct appeal counsel was ineffective in failing to invoke relaxed waiver to seek the benefit of a new federal constitutional rule which was not in existence at the time of trial, and the benefit of which was not sought below. Specifically, there is a strong argument to be made that such an ineffectiveness claim should be governed by the heightened prejudice standard set forth in *Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), rather than the prejudice standard governing more typical *Strickland* claims. The *Lockhart* rule is somewhat obscure, and to understand properly its relationship to *Strickland*, it is best simply to reproduce the High Court's most recent description of the doctrine:

> It is true that while the *Strickland* test provides sufficient guidance for resolving virtually all ineffective-assistance-of-counsel claims, there are situations in which the overriding focus on fundamental fairness may affect the analysis. Thus, on the one hand, as *Strickland* itself explained, there are a few situations in which prejudice may be presumed.... And, on the other hand, there are also situations in which it would be unjust to characterize the likelihood of a different outcome as legitimate "prejudice." Even if a defendant's false testimony might have persuaded the jury to acquit him, it is not fundamentally unfair to conclude that he was not prejudiced by counsel's interference with his intended perjury. *Nix v. Whiteside*, 475 U.S. 157, 175–176, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986).
>
> Similarly, in *Lockhart* we concluded that, given the overriding interest in fundamental fairness, the likelihood of a different outcome attributable to an incorrect interpretation of the law should be regarded as a potential "windfall" to the defendant rather than the legitimate "prejudice" contemplated by our opinion in *Strickland* The death sentence that Arkansas had imposed on Bobby Ray Fretwell was based on an aggravating circumstance (murder committed for pecuniary gain) that duplicated an element of the underlying felony (murder in the course of a robbery). Shortly before the trial, the United States Court of Appeals for the

Eighth Circuit had held that such "double counting" was impermissible, *see Collins v. Lockhart,* 754 F.2d 258, 265 (1985), but Fretwell's lawyer (presumably because he was unaware of the *Collins* decision) failed to object to the use of the pecuniary gain aggravator. Before Fretwell's claim for federal habeas corpus relief reached this Court, the *Collins* case was overruled. Accordingly, even though the Arkansas trial judge probably would have sustained a timely objection to the double counting, it had become clear that the State had a right to rely on the disputed aggravating circumstance. Because the ineffectiveness of Fretwell's counsel had not deprived him of any substantive or procedural right to which the law entitled him, we held that his claim did not satisfy the "prejudice" component of the *Strickland* test.

Cases such as *Nix v. Whiteside,* 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986), and *Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), do not justify a departure from a straightforward application of *Strickland* when the ineffectiveness of counsel *does* deprive the defendant of a substantive or procedural right to which the law entitles him. In the instant case, it is undisputed that Williams had a right—indeed, a constitutionally protected right—to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer.

*Williams v. Taylor,* 529 U.S. 362, 391–93, 120 S.Ct. 1495, 1512–13, 146 L.Ed.2d 389 (2000) (citations and footnotes omitted); *accord Lockhart,* 506 U.S. at 372, 113 S.Ct. at 844 (prejudice component of *Strickland* test "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.... Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him.") (citations omitted).

As the Majority notes, the Supreme Court has held that *Mills* established a new constitutional rule, which is not enti-

tled to retroactive operation upon collateral attack. *Beard v. Banks,* 542 U.S. 406, 124 S.Ct. 2504, 159 L.Ed.2d 494 (2004). Appellant's trial in this case, which pre-dated *Mills,* unquestionably was conducted in conformity with governing pre-*Mills* law: he was deprived of no substantive or procedural trial right to which the law entitled him. Moreover, since *Mills* does not apply retroactively to those who failed to preserve a *Mills* claim for direct review, appellant was not entitled to its benefit on appeal once he had failed to preserve an objection below. In such a circumstance, it would be an arbitrary windfall to allow the doctrines of relaxed waiver—a doctrine since abrogated by this Court, *see Commonwealth v. Freeman,* 573 Pa. 532, 827 A.2d 385 (2003), no less than the *Collins* rule at issue in *Lockhart* was eventually overturned—and ineffective assistance of counsel to permit appellant to upset a final verdict which was fundamentally fair when rendered.[6]

Finally, with respect to appellant's claim of ineffective assistance of counsel concerning mitigation evidence, although I agree that this issue should be remanded, I must reiterate my concern with the Majority's reliance upon authority which did not exist at the time of this trial in 1981, which is the only relevant time for purposes of evaluating counsel's conduct in this regard. Indeed, the seminal decision in *Strickland*—a case which likewise involved alleged ineffective assistance at the penalty phase—did not yet exist at the time of trial. The Majority does not cite to a **single** case which was in existence at the time of appellant's trial, and yet it states the governing law with a certitude that misleadingly suggests that the principles it discusses are timeless, and were settled in 1981. I believe that it is at least debatable whether guidance provided by the High Court in a decision so recent as *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), for example, may properly be invoked to second-guess the decisions counsel was required to make in 1981, even before *Strickland* was decided. Accordingly, I would make clear,

---

**6.** It might be a different circumstance if the defendant could point to an identically situated appellant, whose direct appeal counsel in fact secured the benefit of the new rule by invoking relaxed waiver, resulting in an award of appellate relief. Such is not the case here.

where the Majority does not, that upon remand appellant will have the burden of proving that counsel's performance with respect to evidence of mitigation was deficient and prejudicial according to the law in existence in 1981, and not according to standards which were only announced much later on.

Justice EAKIN joins this concurring and dissenting opinion.